UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FIDELITY INFORMATION SERVICES, INC.,<br><br>                          Plaintiff,<br><br>v.<br><br>DEBTDOMAIN GLMS PTE LTD.,<br>DEBTDOMAIN (USA) INC.<br>and DAVID LEVY, and SETH ROTHMAN,<br><br>                          Defendants. | Case No. 09-cv-07589-LAK<br><br>ECF Case<br><br>**ANSWER AND<br>COUNTERCLAIM OF<br>DEFENDANT DEBTDOMAIN<br>GLMS PTE LTD. TO THIRD<br>AMENDED COMPLAINT** |

Defendant Debtdomain GLMS Pte Ltd. ("Debtdomain GLMS"), by its attorneys Chadbourne & Parke LLP, hereby answers the Third Amended Complaint ("3AC") of Plaintiff Fidelity Information Services, Inc. ("Plaintiff") as follows:

## AS TO NATURE OF ACTION

1.      Debtdomain GLMS denies the allegations in paragraph 1 of the 3AC.

2.      Debtdomain GLMS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2 of the 3AC, and therefore denies the same.

3.      Debtdomain GLMS denies the allegations in paragraph 3 of the 3AC, except admits that Debtdomain GLMS sells Debtdomain Syndication software.

4.      Debtdomain GLMS denies the allegations in paragraph 4 of the 3AC.

5.      Debtdomain GLMS admits that Plaintiff has filed a civil action alleging copyright infringement and common law unfair competition, but Debtdomain GLMS denies that

any such violations have occurred, and otherwise denies all remaining allegations in paragraph 5 of the 3AC.

6.     Debtdomain GLMS admits that Plaintiff has filed a civil action alleging breach of a non-competition agreement by David Levy, but Debtdomain GLMS denies that any such violation has occurred, and otherwise denies all remaining allegations in paragraph 6 of the 3AC.

## AS TO JURISDICTION AND VENUE

7.     Debtdomain GLMS admits that Plaintiff purports to premise this Court's jurisdiction of the action on the statutes cited in paragraph 7 of the 3AC.

8.     Debtdomain GLMS admits that Plaintiff purports to premise this Court's jurisdiction of the action on the statute cited in paragraph 8 of the 3AC, but lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8 of the 3AC, and therefore denies the same.

9.     Debtdomain GLMS denies that the Court has personal jurisdiction over Debtdomain GLMS or that venue may lie in this judicial district under 28 U.S.C. § 1400(b), but states that Debtdomain GLMS has now elected not to challenge personal jurisdiction or venue in this action, and to waive such defenses, and otherwise denies the remaining allegations in paragraph 9 of the 3AC.

## AS TO PARTIES

10.     Debtdomain GLMS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10 of the 3AC, and therefore denies the same.

11.     Debtdomain GLMS admits that Debtdomain GLMS is a company organized and existing under the laws of Singapore, but denies that it has a place of business at 260 Madison Avenue, 8th Floor, New York, New York 10016.

12.     Debtdomain GLMS admits, on information and belief, the allegations in paragraph 12 of the 3AC.

13.     Debtdomain GLMS admits, on information and belief, the allegations in paragraph 13 of the 3AC.

14.     Debtdomain GLMS admits, on information and belief, the allegations in paragraph 14 of the 3AC.

## AS TO FACTS COMMON TO ALL CLAIMS

15.     Debtdomain GLMS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 of the 3AC, and therefore denies the same.

16.     Debtdomain GLMS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 of the 3AC, and therefore denies the same.

17.     Debtdomain GLMS denies the allegations in paragraph 17, except admits that a copy of the purported registrations pertaining to United States Copyright Registrations Nos. TX 6-943-321 and TX 6-943-322 are annexed to the 3AC and affirmatively avers that Plaintiff's works are insufficiently original to be copyrightable.

18.     Debtdomain GLMS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18 of the 3AC, and therefore denies the same.

19.     Debtdomain GLMS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the 3AC, and therefore denies the same.

20.     Debtdomain GLMS denies the allegations in paragraph 20 of the 3AC.

21.     Debtdomain GLMS denies the allegations in paragraph 21, except admits that a copy of the purported Non-Competition Agreement is annexed to the 3AC.

22.     Debtdomain GLMS admits that paragraph 22 quotes a portion of the language from the Non-Competition Agreement annexed to the 3AC.

23.     Debtdomain GLMS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23 of the 3AC, and therefore denies the same.

24.     Debtdomain GLMS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24 of the 3AC, and therefore denies the same.

25.     Debtdomain GLMS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25 of the 3AC, and therefore denies the same.

26.     Debtdomain GLMS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26 of the 3AC, and therefore denies the same.

27.     Debtdomain GLMS admits that as of the date of this Answer David Levy is the co-CEO of Debtdomain USA, but otherwise denies the remaining allegations in paragraph 27 of the 3AC

28.     Debtdomain GLMS admits that it sells a software program entitled Debtdomain Syndication throughout the world excluding the Americas, but otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28 of the 3AC, and therefore denies the same.

29.     Debtdomain GLMS denies the allegations in paragraph 29 of the 3AC.

30.     Debtdomain GLMS denies the allegations in paragraph 30 of the 3AC.

31.     Debtdomain GLMS denies the allegations in paragraph 31 of the 3AC.

32.     Debtdomain GLMS denies the allegations in paragraph 32 of the 3AC.

## AS TO FIRST CLAIM FOR RELIEF:
### COPYRIGHT INFRINGEMENT (17 U.S.C. § 501)
**(As Against All Defendants)**

33.     Debtdomain GLMS realleges and incorporates by reference as if fully set forth at length herein its responses to paragraphs 1 through 32 of the 3AC.

34.     Debtdomain GLMS denies the allegations in paragraph 34 of the 3AC.

35.     Debtdomain GLMS denies the allegations in paragraph 35 of the 3AC.

36.     Debtdomain GLMS denies the allegations in paragraph 36 of the 3AC.

37.     Debtdomain GLMS denies the allegations in paragraph 37 of the 3AC.

38.     Debtdomain GLMS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38 of the 3AC, and therefore denies the same.

**AS TO SECOND CLAIM FOR RELIEF:**
**COMMON LAW UNFAIR COMPETITION**
**(As Against All Defendants)**

39.     Debtdomain GLMS realleges and incorporates by reference as if fully set forth at length herein its responses to paragraphs 1 through 38 of the 3AC.

40.     Debtdomain GLMS denies the allegations in paragraph 40 of the 3AC.

**AS TO THIRD CLAIM FOR RELIEF:**
**BREACH OF CONTRACT**
**(As Against Defendant Levy)**

41.     Debtdomain GLMS realleges and incorporates by reference as if fully set forth at length herein its responses to paragraphs 1 through 40 of the 3AC.

42.     Debtdomain GLMS denies the allegations in paragraph 42 of the 3AC.

43.     Debtdomain GLMS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 43 of the 3AC, and therefore denies the same.

**AFFIRMATIVE DEFENSES**

44.     The statement of any defense hereinafter does not assume the burden of proof for any issue as to which applicable law places the burden upon Plaintiff.  Debtdomain GLMS expressly reserves the right to amend and/or supplement their affirmative an other defenses at such time and to such extent as discover and factual developments establish a basis therefor Further answering the complaint, Debtdomain GLMS pleads the following affirmative defenses:

## First Affirmative Defense
### (Failure to State a Claim)

45.     The 3AC fails to state a claim upon which relief may be granted.

## Second Affirmative Defense
### (Invalidity)

46.     Plaintiff's claims are barred to the extent Plaintiff does not hold a valid copyright registration in the copyrights annexed to the 3AC.

## Third Affirmative Defense
### (Fraud on the Copyright Office)

47.     Plaintiff engaged in fraud on the Copyright Office in that on or about July 2, 2009 it intentionally made the false representations in its applications for registration Nos. TX 6-943-321 and TX 6-943-322 that it authored the subject work, and its misrepresentation was material in that in its absence registration would not have issued.

## Fourth Affirmative Defense
### (Non-Infringement)

48.     Debtdomain GLMS did not copy, unlawfully appropriate, or otherwise infringe any valid copyrights of Plaintiff.

## Fifth Affirmative Defense
### (Lack of Originality)

49.     Plaintiff's allegedly infringed work is not sufficiently original to be copyrightable.

## Sixth Affirmative Defense
### (Merger)

50.     Even if Plaintiff's work were sufficiently original to be protected by copyright, which it is not, any allegedly original material in Plaintiff's work is capable in expression in only a limited number of ways and therefore plaintiff's claims are barred by the doctrine of merger.

## Seventh Affirmative Defense
### (*Scenes-a-Faire*)

51.     Even if Plaintiff's work were sufficiently original to be protected by copyright, which it is not, any allegedly original material in Plaintiff's work is capable in expression in only a limited number of ways and therefore plaintiff's claims are barred by the doctrine of *scenes-a-faire*.

## Eighth Affirmative Defense
### (Uncopyrightable Subject Matter)

52.     Any alleged similarities, if any, between Plaintiff's work and that of Debtdomain GLMS relate to nonprotectable elements, and hence, nonprotectable subject matter under the Copyright Act.

## Ninth Affirmative Defense
### (*De Minimis* Use)

53.     Any alleged use of portion of Plaintiff's work as asserted by Plaintiff is *de minimis* and hence non-infringing.

**Tenth Affirmative Defense**
**(Fair Use)**

54.     Any alleged use by Debtdomain GLMS of Plaintiff's allegedly infringed work, or any element thereof, was fair use and therefore non-infringing as a matter of law.

**Eleventh Affirmative Defense**
**(Independent Creation)**

55.     The allegedly infringing work was independently created.

**Twelfth Affirmative Defense**
**(Preempted by Copyright Act)**

56.     All legal and equitable rights set forth in the Second Cause of Action is preempted pursuant to 17 U.S.C. § 301.

**Thirteenth Affirmative Defense**
**(Preempted by Federal Law)**

57.     Plaintiff's common law unfair competition claim is preempted by federal law.

**Fourteenth Affirmative Defense**
**(Unclean Hands)**

58.     Plaintiff's claims are barred because of unclean hands and are not entitled to equitable relief on that basis.

**Fifteenth Affirmative Defense**
**(Statute of Limitations)**

59.     Plaintiff's claims are barred by the relevant statues of limitations.

**Sixteenth Affirmative Defense**
**(Laches, Waiver, Acquiescence, and/or Estoppel)**

60.    Plaintiff's claims are barred by the doctrines of laches, waiver, acquiescence, and/or estoppel.

**Seventeenth Affirmative Defense**
**(No Irreparable Harm)**

61.    Plaintiff's claim for injunctive relief is barred because plaintiff cannot show that tit will suffer any irreparable harm.

**Eighteenth Affirmative Defense**
**(No Damages)**

62.    Plaintiff has not sustained any injury or damages as a result of any act or conduct by Defendant.

**Nineteenth Affirmative Defense**
**(Failure to Mitigate Damages)**

63.    Plaintiff has failed to mitigate, obviate, diminish or otherwise act to lessen or reduce the injuries, damages and disabilities they allegedly suffered as a result of any act or conduct by Defendant.

**Twentieth Affirmative Defense**
**(Innocent Infringement)**

64.    Plaintiff's damages, if any, should be mitigated in whole or in party by the doctrine of innocent infringement and/or innocent intent.

**Twenty-First Affirmative Defense**
**(No Attorneys' Fees or Other Statutory Damages)**

65.     Plaintiff is not entitled to an award of attorneys' fees or any other statutory damages under 17 U.S.C. § 101 *et seq*.

## COUNTERCLAIMS

Defendant-counterclaim-plaintiff Debtdomain GLMS, by its attorneys Chadbourne & Parke LLP, as and for its counterclaims against Plaintiff-counterclaim-defendant Fidelity Information Services, Inc. ("Fidelity"), alleges as follows:

## NATURE OF THE COUNTERCLAIMS

66.     Debtdomain GLMS's Web-based loan syndication application ("Debtdomain Syndication") has been in continual development since 2001.  Debtdomain Syndication is used by thousands of users daily from over 100 bank clients, and has been used to launch more than 3,000 syndicated deals.  Today Debtdomain GLMS is the established global leader in the development and sale of fully web-based software for primary loan syndication and loans agency.  Debtdomain Syndication is a highly regarded product with numerous innovations — flexible, capable, widely-used and easy to use, as corroborated by bank press releases and testimonials.  Although Debtdomain GLMS is a small corporation, with a limited number of employees, it has been successful in this business, and its customers include some of the largest banks in the world, including numerous banks who were previously clients of a competing product marketed by Fidelity.  The banks in the syndicated loan market wanted a fully web-based loan syndication system that incorporated sole and joint-bookrunning, documents,

investor call notes and deal and business reporting, and this is what Debtdomain Syndication provided.

67.     Fidelity is a Fortune 500 company whose shares are publicly traded on the New York Stock Exchange, and that employs, on information and belief, approximately 30,000 persons.  Fidelity sells a loan syndication software product known as SyndTrak.  While Fidelity also counts some of the largest banks as its customers, due to antiquated client-server based technology, high prices, lack of innovation of SyndTrak 3 (which from 2003-2009 was the same version, and which failed to offer a web-based syndication system despite numerous requests from SyndTrak clients), loss of staff and poor customer service, Fidelity has lost many customers.  Prior to 2010, Fidelity never had a web-based syndication/bookrunning application.

68.     Aware of the competitive threat that Debtdomain GLMS's software product presented and still presents to Fidelity's remaining customers, around March 2009, Fidelity employees under the guidance of Fidelity management engaged in illegal industrial espionage in which a third-party confederate had been persuaded to pose as a potential Debtdomain GLMS customer as a means of procuring highly confidential and trade secret-containing materials about Debtdomain GLMS's web-based products and services that Debtdomain GLMS discloses only to legitimate potential Debtdomain GLMS customers, and only then with confidentiality protections.    After Fidelity employees received Debtdomain GLMS's highly confidential information from this confederate, they spread the information around the Fidelity organization to top officials and to top members of Fidelity's SyndTrak 4 software development team, and used Debtdomain GLMS's highly confidential and trade secret information to design a new

fully-web based Fidelity product, SyndTrak 4, in the hopes of being able to compete more effectively with Debtdomain GLMS's superior products and service. SyndTrak 4's features and functions closely resemble that of Debtdomain Syndication, and a number of Debtdomain GLMS clients in London that have received demonstrations of SyndTrak 4 have told Debtdomain GLMS staff that the workflow, layout and terminology used in SyndTrak 4 is very similar to that of Debtdomain Syndication.

69.     Debtdomain GLMS brings these counterclaims to obtain permanent injunctive relief against the sale of SyndTrak 4 and other Fidelity software that incorporates the highly confidential and trade secret materials misappropriated from Debtdomain GLMS through Fidelity's unlawful, criminal and shameful conduct and to recover the damages suffered by Debtdomain GLMS due to such conduct and misappropriation.

## PARTIES

70.     Debtdomain GLMS is a corporation organized and existing under the laws of the Republic of Singapore, having its principal place of business in London, England.

71.     Upon information and belief, Fidelity is a corporation organized under the laws of the State of Arkansas with a principal place of business at 601 Riverside Avenue, Jacksonville, Florida 32204.

## FACTS COMMON TO ALL COUNTERCLAIMS

### Fidelity's Plan to Acquire Confidential Debtdomain Information

72.    In or about mid-March 2009, Richard Levy, the president of Fidelity's ACBS division which sells the SyndTrak product was █████████ REDACTED █████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ Accordingly, at this time, among other things, Richard Levy began █████ REDACTED █████

████████████████████████████████████████████████████

████████████████████████████████

73.    Kaushik Punjabi ("Punjabi"), a Fidelity sales manager, was █████ REDACTED █████

████████████████████████████████████████████████████

████████████████████████████████

74.    Ariel Elkayam ("Elkayam"), Fidelity's head of front office products in the ACBS division, was █████ REDACTED █████

75.    On or about March 18, 2009, Elkayam sent an e-mail to Punjabi, cc'd to Pedro Pereiro ("Pereiro"), a Fidelity business analyst, listing various questions to be asked of Debtdomain concerning its product by a confederate who would pose as a sales prospect of Debtdomain.  These questions included, without limitation, questions about Debtdomain's pricing, Debtdomain's reporting capabilities, what Debtdomain perceived as the competitive advantages of its product, Debtdomain's use of public databases, and Debtdomain's tracking capabilities.

76.     Later that same day, March 18, 2009, Punjabi at Elkayam's express request sent an e-mail to Tarbir Shahpuri ("Shahpuri"), a friend or acquaintance of his who was then working for an Indian investment bank called Edelweiss Capital.

77.     From Punjabi's [REDACTED]

78.     Punjabi's March 18, 2009 e-mail to Shahpuri set forth a lightly edited version of the questions Punjabi had received from Elkayam.  At or about this same time, or possibly in an earlier telephone conversation, Punjabi on behalf of Fidelity asked Shahpuri to contact Debtdomain, pose as a potential customer who might be interested in Debtdomain's product, and seek answers, documents and other information that would help respond to the questions that were set forth in Punjabi's March 18, 2009 e-mail to Shahpuri.  Shahpuri agreed to do so, either during or shortly after this contact from Punjabi.

79.     Elkayam was [REDACTED]

**The March 31, 2009 Telephone Call to Debtdomain GLMS**

80.     On March 31, 2009, pursuant to Punjabi's request and acting on behalf of Fidelity and Punjabi, Shahpuri contacted the office of Debtdomain GLMS by telephone, and reached Tim Skinner ("Skinner"), a senior employee of Debtdomain GLMS.  Shahpuri then had a telephone conversation with Skinner during which Shahpuri posed as a potential customer for Debtdomain GLMS's product and sought information and documents that would respond to the questions that Punjabi had set forth for Shahpuri in Punjabi's March 19, 2009 e-mail to Shahpuri.

81.     Specifically, in his March 31, 2009 telephone conversation with Skinner, Shahpuri falsely identified himself as being an Associate Director with Edelweiss Capital, which was a company the name of which was known to Skinner.  Shahpuri stated to Skinner that he was potentially interested in purchasing the Debtdomain product because he was setting up a new loan desk for Edelweiss.  In fact, this statement was knowingly false, as Shahpuri and Edelweiss Capital were not setting up any such loan desk and had no interest whatsoever in purchasing the Debtdomain product.

82.     During his March 31, 2009 telephone conversation with Shahpuri, Skinner was unaware that Shahpuri was misrepresenting himself, and Skinner reasonably believed that Shahpuri and/or his company Edelweiss Capital were legitimate potential customers for Debtdomain GLMS's product.

83.     In reasonable reliance upon the misrepresentations made by Shahpuri to Skinner during the March 31, 2009 telephone conversation, and the status of Edelweiss Capital as a

reputable financial services company, Skinner provided Shahpuri telephonically during that conversation with various confidential and proprietary information regarding Debtdomain that Debtdomain makes available only to legitimate customers truly interested in potentially purchasing the Debtdomain product.  Skinner would never had done so if Shahpuri had honestly disclosed the true capacity in which he was seeking information from Debtdomain GLMS, or even disclosed that neither he nor his company was truly interested in potentially purchasing the Debtdomain product.

84.     Following Shahpuri's telephone conversation with Skinner, Shahpuri on March 31, 2009 sent a detailed summary to Punjabi of what he had learned from that conversation, possibly in the form of an attachment to an e-mail message.

85.     Punjabi on March 31, 2009 forwarded the text of Shahpuri's summary to Elkayam and Pereiro.

86.     The next day, April 1, 2009, Elkayam forwarded to Scott Kostyra, Fidelity's head of sales, and Richard Levy, the president of Fidelity's ABCS division, a copy of the March 31, 2009 e-mail that Elkayam had received from Punjabi, with the following cautionary note:

> "Kaushik [Punjabi] had one of his friends contact DD and ask for information on their product.  Please see write-up of conversation below.  Please keep this confidential as Kaushik's friends [sic] is worried about repercussions inside his firm if this gets found out."

87.     Elkayam also sent an e-mail to Punjabi on April 1, 2010, in reply to Punjabi's e-mail forwarding the report from Shahpuri.  Elkayam's message to Punjabi stated, "Thanks. Excellent job.  I forwarded to Richard [Levy] and Scott [Kostyra] but asked them to keep this confidential."

**Skinner's Follow-Up to the March 31, 2009 Telephone Call**

88.    On March 31, 2009, after his telephone call with Shahpuri, Skinner — in further reasonable reliance upon Shahpuri's misrepresentations to him during their telephone conversation and the status of Edelweiss Capital as a reputable financial services company — attempted to send an e-mail to Shahpuri following up on their telephone conversation.  This e-mail included additional confidential and proprietary information regarding Debtdomain GLMS and its Debtdomain software product, including attachments of certain documents (the "Confidential Documents").   Skinner would never had done so if Shahpuri had honestly disclosed the true capacity in which he had sought information from Debtdomain, or had even disclosed that neither he nor his company was truly interested in the Debtdomain product.

89.    Skinner's March 31, 2009 e-mail was not received by Shahpuri at or around the time it was sent, however, because Skinner at that time had and used an incorrect e-mail address for Shahpuri.

90.    At some point thereafter, Shahpuri contacted Skinner again, inquiring about the status of Skinner's sending him follow-up documentation about Debtdomain GLMS's products and services, and providing another e-mail address for himself.  However, that e-mail address also proved to be invalid.

91.    On Monday, April 20, 2009, Skinner telephoned Shahpuri's office.  Although Shahpuri was not in the office at that time, Skinner was able to obtain Shahpuri's correct e-mail address from one of Shahpuri's colleagues.  Skinner then forwarded to Shahpuri at the correct e-

mail address on April 20, 2009 a copy of Skinner's previously un-delivered March 31, 2009 e-mail to Shahpuri, including the Confidential Documents that had been attached thereto.

92.     The Confidential Documents consisted of the following electronic documents:

- Syndicator Features & Benefits A4.pdf
- Debtdomain fee for primary syndication.pdf
- Debtdomain SLX.pdf
- Debtdomain Syndication.pdf

93.     The Confidential Documents all bore the legend "Statement of Confidentiality," following which was stated either:

"The contents of this document represent proprietary information of Debtdomain GLMS Pte Ltd ('Debtdomain').  This information is strictly confidential and for the use of current and prospective Debtdomain clients only.  This information may not be disclosed to any third party, other than the direct addressee and its employees, agents and representatives.   The infringement of this prohibition may violate Debtdomain proprietary and trade secret rights with resulting irreparable damage to Debtdomain."

or

"The contents of this document represent proprietary information of Debtdomain GLMS Pte Ltd (DD).  This information may not be disclosed to any third party, other than the direct addressee and its employees, agents and representatives.  The infringement of this prohibition may violate DD proprietary and trade secret rights with resulting damage to DD.  Your cooperation is requested and appreciated.  Thank you for your help in this matter."

94.     The Confidential Documents also were marked "Confidential & Proprietary" at the bottom of each page.

**The Circulation of the Confidential Documents To and Within Fidelity**

95.     Notwithstanding the legend on the Confidential Documents, Shahpuri on April 21, 2009 forwarded Skinner's April 20, 2009 e-mail message (including the attached

Confidential Documents) to Punjabi, addressed not to Punjabi's e-mail address at Fidelity but rather to Punjabi's personal e-mail address on *hotmail.com*.

96.     Within 10 minutes after receiving Shahpuri's April 21, 2009 e-mail, Punjabi forwarded Shahpuri's e-mail to Punjabi's own Fidelity e-mail account.  Then, from his Fidelity e-mail account, Punjabi sent an e-mail message bearing the subject-line designation "DD", labeled with "High" importance, to Elkayam and Pereiro.   This message attached the Confidential Document "Document Syndicator Features & Benefits A4.pdf" with the accompanying exclamatory message "It's here, in time for the 3pm !!"  A few minutes later, Punjabi sent a reply e-mail to Shahpuri, stating "Thanks a million".

97.     Shortly after receiving Punjabi's April 21, 2009 e-mail, Pereiro forwarded a copy of that e-mail to Brad Medd ("Medd"), a Fidelity employee who managed the product management, development and operations for the front office products like SyndTrak 4 within the ACBS unit of Fidelity, and Shanin Clark ("Clark"), a Fidelity developer working on Fidelity's SyndTrak 4 product, cc'ing Punjabi, with the message "Kaushik has managed to get a brochure from DD.  Please see attached."  Punjabi immediately then sent out a worried "reply all" response to Pereiro, Medd and Clark, stressing "Please keep this document extremely confidential."

98.     Punjabi's April 21, 2009 e-mail continued to make its way to various other persons within Fidelity.  On May 14, 2009, Clark forwarded a copy of that e-mail to Matthew Reitano ("Reitano"), Fidelity's lead architect on the SyndTrak 4 project.  Clark did so because

REDACTED

20

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████ Reitano then forwarded a copy of this e-mail to Eric Cetron, a Fidelity software developer, on June 19, 2009.

**Shahpuri's Termination of Contact with Debtdomain GLMS**

99.     After Shahpuri received Skinner's April 20, 2009 e-mail that had attached the Confidential Documents, Shahpuri sent a short e-mail response to Skinner stating "Thanks[,] apologies for the lack of communication.  I will be back in [M]umbai on the 5th and will call you if I need anything further."  After sending this e-mail, Shahpuri forwarded a copy of this e-mail to Punjabi at his personal e-mail address on *hotmail.com*.

100.     Shahpuri thereafter ceased all communication with Skinner or Debtdomain GLMS.

**Nature and Value of the Confidential Documents and Other Information that Fidelity Obtained from Debtdomain GLMS**

101.     The Confidential Documents and the other information obtained by Shahpuri contained valuable trade secrets and other confidential information proprietary to Debtdomain GLMS.  The Confidential Documents and the other information obtained by Shahpuri provided elaborate detail concerning the prices and pricing schemes for various Debtdomain GLMS products and offerings; the features and functionality of Debtdomain GLMS's products, including those that make its products unique and competitive in the loan syndication market; security, support and service information. More specifically, the Confidential Documents

contained a description of Debtdomain Syndication's unique data model and included 19 screen shots of Debtdomain Syndication including Deal Menu, Deal Team, Link Investors, Bookrunning Page, Integrated Documents Page, Document Permissions, Joint Bookrunning Sharing Options, Contact Action Window, Joint Bookrunner Syndication Status Report, Investor Report, Investor Screen, Pipeline, Allocations, Commitments Report, Decline Analytics and other visuals relating to Debtdomain GLMS's products; a Debtdomain Syndication Database Schematic / Data Model; and many other items relating to Debtdomain GLMS's products.   Many of the 19 screenshots included annotations which showed a user how they operated.

102.    Most notably, the Confidential Documents discuss the approach that Debtdomain GLMS developed to be able to offer its customers the functionality to support joint bookrunning, a feature that Fidelity had never included in its SyndTrak product prior to the time that Fidelity obtained the Confidential Documents from Debtdomain GLMS.

103.    Developing Debtdomain Syndication and the features noted above had required over nine years of effort by Debtdomain GLMS at a cost of over $7 million.

104.    The Confidential Documents and the information they contain, and much of the other information obtained by Shahpuri during his March 31, 2009 telephone call with Skinner, were not available to the public at large but rather were kept strictly confidential by Debtdomain GLMS.  This information was known to less than ten persons within Debtdomain GLMS and Debtdomain USA.  The Confidential Documents had been made available only to a limited number of potential Debtdomain customers, each time subject to the strict confidentiality

restrictions expressly set forth on the face of those documents and the legend stating "Confidential & Proprietary" at the bottom of every page of those documents. The Confidential Documents and the information they contain could not be acquired by competitors of Debtdomain GLMS by legitimate means, nor independently developed by them except at a cost of time and money equivalent to that which Debtdomain GLMS incurred in developing such information itself.

105.   Because of the level of detail and the vast array of information contained in the Confidential Documents, the highly confidential information misappropriated by Fidelity was extremely valuable. In fact, its extraordinary value is demonstrated by the great lengths taken by Fidelity and its employees, working surreptitiously with a third-party confederate who fraudulently misrepresented himself, to acquire the information from Debtdomain, and Fidelity's subsequent use of that information in the development of SyndTrak 4 in the hope of finally being able to compete effectively with Debtdomain GLMS's product.

## Consequences

106.   As a result of the foregoing, Fidelity obtained valuable proprietary and confidential documents and information and trade secrets from Debtdomain GLMS that Fidelity would not have been able to obtain by lawful means.

107.   Fidelity used the information found in the Confidential Documents in creating its own web-based loan syndication product with joint bookrunning capabilities, SyndTrak 4. SyndTrak 4 contains features and uses methods enumerated and described in the Confidential

Documents, which features and methods were not part of the previous version of Fidelity's web-based loan syndication product, SyndTrak 3.

108.     By obtaining the Confidential Documents and other confidential, proprietary and trade secret information from Debtdomain GLMS as described above, Fidelity was able to get a head start on and accelerate its efforts to develop a fully web-based SyndTrak 4 product, accomplishing in about one year what had taken Debtdomain GLMS nine years of development. At a minimum, this enabled Fidelity to bring such product to market faster than Fidelity otherwise could have done through lawful means.  Indeed, on information and belief, without obtaining such information, Fidelity would never have been able to bring to market a SyndTrak product that would have competed effectively with Debtdomain GLMS's product.  While in 2008 and 2009, competitors of Debtdomain GLMS such as Intralinks, Misys and Dealogic all developed a new comprehensive web-based syndication system that was broadly similar to Debtdomain Syndication yet still failed to gain new sales.  SyndTrak 4, by contrast, was the first system that competed effectively with Debtdomain GLMS's product.

109.     Fidelity's misappropriation and use of Debtdomain GLMS's Confidential Documents and other confidential and proprietary information and trade secrets has caused Debtdomain GLMS to suffer lost sales to SyndTrak 4, including without limitation at Wells Fargo/Wachovia, Suntrust, TD Bank, Rabobank New York, Handelsbanken, and other banks. In addition and more importantly, Fidelity can now point to the successful sales of SyndTrak 4 to these banks to encourage other potential clients and attempt to start a snowball effect.

Furthermore, Debtdomain GLMS has had to lower its subscription prices to both existing and potential clients now that Fidelity is able to more effectively compete on a product basis.

110.   Debtdomain GLMS has suffered damages due to Fidelity's wrongful conduct in an amount to be determined at trial but not less than $15 million on a present value basis.

111.   Fidelity's misappropriation and use of Debtdomain GLMS's Confidential Documents and other confidential and proprietary information and trade secrets also has caused and continues to cause Debtdomain GLMS to suffer certain irreparable injuries that cannot be adequately be remedied by an award of money damages.   These include injuries to the competitive advantage and reputation that the Debtdomain product enjoyed over the SyndTrak product as it existed in the Spring of 2009, when SyndTrak contained no capabilities for handling joint bookrunning and no web-based syndication/bookrunning system, and the good will that Debtdomain GLMS enjoyed with its customers and potential customers by virtue of the capabilities of its product.   Fidelity's misappropriation of the Confidential Documents and other Debtdomain GLMS confidential material and information enabled Fidelity to reduce to a greater extent, and/or earlier than Fidelity could have done solely through lawful means, the competitive advantage that Debtdomain GLMS's product enjoyed over Fidelity's inferior client server based SyndTrak 3 product.

## AS AND FOR A FIRST COUNTERCLAIM
### (Common-Law Fraud)

112.   Debtdomain GLMS repeats and realleges each and every allegation contained in paragraphs 66 through 111 above as if fully set forth at length herein.

113.   Fidelity, by its employees and agents, caused false statements of fact knowingly to be made to a Debtdomain GLMS representative by Shahpuri, for the purpose of obtaining the Confidential Documents and other valuable confidential and proprietary and trade secret information that Fidelity could not have obtained by lawful means.  Fidelity did so knowingly, intentionally and with the intent to defraud Debtdomain GLMS.

114.   Debtdomain GLMS, acting in reasonable reliance on Shahpuri's misrepresentations and the status of Edelweiss Capital, the company on whose behalf Shahpuri claimed to be acting, provided the Confidential Documents and other valuable confidential and proprietary and trade secret information to Shahpuri, who in turn provided them to Fidelity at Fidelity's request.  Debtdomain GLMS never would have done so absent the misrepresentations that were made to it by Shahpuri.

115.   As a proximate result of the foregoing actions by Fidelity, its employees and their confederate, Fidelity has caused and continues to cause Debtdomain GLMS to suffer monetary damage as well as irreparable injury as alleged above.   Debtdomain GLMS accordingly is entitled to an award of compensatory damages and injunctive relief against Fidelity as prayed for below.

116.   Fidelity's actions with regard to causing the contact to be made to Debtdomain GLMS by Shahpuri and then using the illicit fruits thereof to bolster Fidelity's own business and software product against Debtdomain GLMS in the marketplace were malicious, egregious, outrageous, intentional, knowing, fraudulent, dishonest, unjustified and morally culpable, and indeed criminal.  They were not undertaken for any legitimate competitive or other purpose.

Indeed, Fidelity's actions were so outrageous as to evince such a high degree of moral turpitude, and showed such dishonesty, as to imply criminal indifference to civil obligations.

117.    Accordingly, in addition to being entitled to compensatory damages and injunctive relief, Debtdomain GLMS is entitled to an award of punitive damages against Fidelity as prayed for below.

### AS AND FOR A SECOND COUNTERCLAIM
**(Misappropriation of Trade Secrets)**

118.    Debtdomain GLMS repeats and realleges each and every allegation contained in paragraphs 66 through 117 above as if fully set forth at length herein.

119.    The Confidential Documents and other valuable confidential and proprietary information that Fidelity obtained from Debtdomain GLMS as alleged above contained valuable trade secrets proprietary to Debtdomain GLMS.

120.    Fidelity unlawfully misappropriated Debtdomain GLMS's trade secrets and used those trade secrets for its own commercial advantage, to the detriment of Debtdomain GLMS, without any lawful justification or excuse.

121.    As a proximate result thereof, Fidelity has caused and continues to cause Debtdomain GLMS to suffer monetary damage as well as irreparable injury as alleged above. Debtdomain GLMS accordingly is entitled to an award of compensatory damages and injunctive relief against Fidelity as prayed for below, and because of the nature of Fidelity' actions as alleged above, an award of punitive damages against Fidelity as prayed for below.

## AS AND FOR A THIRD COUNTERCLAIM
### (Unfair Competition)

122.    Debtdomain GLMS repeats and realleges each and every allegation contained in paragraphs 66 through 121 above as if fully set forth at length herein.

123.    Fidelity's conduct as alleged above constitutes unfair competition under the common law of the State of New York.

124.    As a proximate result thereof, Fidelity has caused and continues to cause Debtdomain GLMS to suffer monetary damage as well as irreparable injury as alleged above. Debtdomain GLMS accordingly is entitled to an award of compensatory damages and injunctive relief against Fidelity as prayed for below, and because of the nature of Fidelity' actions as alleged above, an award of punitive damages against Fidelity as prayed for below.

## AS AND FOR A FOURTH COUNTERCLAIM
### (Unjust Enrichment)

125.    Debtdomain GLMS repeats and realleges each and every allegation contained in paragraphs 66 through 124 above as if fully set forth at length herein.

126.    As a result of the foregoing, Fidelity has unjustly enriched itself at Debtdomain GLMS's expense, in such circumstances that, in equity and good conscience, Fidelity should not be permitted to retain such amounts but rather should make restitution to Debtdomain GLMS in the amount of such unjust enrichment.

## **PRAYER FOR RELIEF**

WHEREFORE, Debtdomain GLMS respectfully requests that the Court enter judgment:

1.      Dismissing the 3AC against Debtdomain GLMS with prejudice in its entirety, with Fidelity taking nothing thereby;

2.      awarding Debtdomain GLMS compensatory damages and restitution on its counterclaims against Fidelity in an amount to be determined at trial but not less than $15 million;

3.      awarding Debtdomain GLMS punitive damages on its counterclaims against Fidelity in an amount to be determined at trial but not less than $25 million;

4.      granting Debtdomain GLMS injunctive relief barring Fidelity from selling, marketing, leasing or otherwise making available to customers, any and all versions of SyndTrak or other products in the development of which Fidelity used or considered any of the Confidential Documents or other valuable confidential and proprietary or trade secret information obtained from Debtdomain GLMS by Shahpuri, either permanently or for a fixed period of time to be determined at trial;

5.      awarding Debtdomain GLMS attorneys' fees and cost of suit; and

6.      awarding Debtdomain GLMS such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Debtdomain GLMS hereby demands a jury trial in this action of all claims so triable.

29

Dated: September 9, 2010          Respectfully submitted,

**CHADBOURNE & PARKE LLP**

By*: s/ Scott S. Balber*     

    Scott S. Balber
    SBalber@chadbourne.com
    Paul J. Tanck
    PTanck@chadbourne.com
    30 Rockefeller Plaza
    New York, New York  10112
    Tel.: (212) 408-5100
    Fax: (212) 541-5369

    *Attorneys for Defendant*
    Debtdomain GLMS Pte. Ltd.