ORIGINALLY FILED UNDER SEAL AS DOCKET NO.: 116

Mark H. Moore
REAVIS PARENT LEHRER LLP
41 Madison Avenue
New York, New York 10010
Tel.: (212) 763-4100
Fax: (212) 763-4141
mmoore@rpl-law.com

*Attorneys for Plaintiff Fidelity Information Services, Inc.*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FIDELITY INFORMATION SERVICES, INC., | |
| Plaintiff, | ECF Case |
| v. | Case No. 09-cv-07589 (LAK)(KNF) |
| DEBTDOMAIN GLMS PTE LTD., DEBTDOMAIN (USA) INC., DAVID LEVY and SETH ROTHMAN, | |
| Defendants. | |

**MEMORANDUM OF LAW OF PLAINTIFF
FIDELITY INFORMATION SERVICES, INC. IN SUPPORT
OF ITS MOTION FOR CONTEMPT AGAINST ALL DEFENDANTS**

TABLE OF CONTENTS

Preliminary Statement...................................................................................................... 1

Statement of Facts Pertinent to Defendants' Contempt.................................................... 4

    A.  Seth Rothman Gains a Comprehensive
        Knowledge of Syndtrak While at CDS and FIS ............................................... 4

    B.  Rothman's Initial Confidentiality And
        Noncompetition Agreement with CDS/FIS .................................................... 6

    C.  Entry of the Rothman Order ........................................................................... 6

    D.  David Levy Approaches Debtdomain......................................................... 7

    E.  David Levy's Plans To Compete Against
        SyndTrak by Making Debtdomain's Product "SyndTrak-Like" ..................... 9

    F.  Debtdomain and Levy's Full Knowledge of the Rothman Order................... 10

    G.  Rothman's Work for Levy and Debtdomain Violates the Rothman Order ................. 11

        1.    Rothman Worked with Debtdomain on Marketing and Strategy ....................... 12

        2.    Rothman Also Worked on Data Conversion for Debtdomain ........................... 14

        3.    Rothman Worked to Debug Critical issues in Debtdomain's Software ............. 16

        4.    Rothman Worked on "Pipeline Management" Features ..................................... 16

        5.    Rothman Also Evaluated Programs to Manage Software Development............ 17

        6.    Rothman Helped With Other Technical Fixes and Software Enhancements
            During His Noncompete Period ......................................................................... 18

        7.    Rothman Worked to Develop Debtdomain's Data Model.................................. 18

    H.  Rothman Worked with Viner to
        Develop The Infringing "Syndtrak-Like" "Notes" Screen ........................... 18

    I.  Debtdomain Markets Rothman to Potential Customers
       as a Key Resource To Ensure Smooth Conversions of SyndTrak Data ...................... 21

    J.  Debtdomain Views Levy and Rothman as Critical to its Survival ............................. 22

Argument ........................................................................................................ 23

POINT I
THE DEFENDANTS SHOULD  BE HELD IN CIVIL CONTEMPT FOR THE
REPEATED VIOLATIONS OF THE ROTHMAN ORDER ................................... 23

A.  Rothman Should Be Held In Civil Contempt For His Repeated And Willful Violations
     Of The Rothman Order .............................................................................. 23

       1.    Rothman Clearly Violated His Obligation Under The Rothman Order Not  To
             Compete With FIS Before September 11, 2008 ...................................... 24

       2.    The Record Contains Clear And Convincing Proof Of Rothman's Systemic
             Violation Of His Confidentiality Obligations........................................ 26

       3.    The Record Demonstrates That Rothman Failed To Diligently Attempt to
             Comply With The Rothman Order .......................................................... 27

B.  By Knowingly And Actively Working To Assist Rothman's  Conduct, Levy And
     Debtdomain Are Also Liable In Contempt.................................................... 28

POINT II
THE APPROPRIATE REMEDIES FOR  DEFENDANTS' CONTUMACIOUS
CONDUCT ....................................................................................................... 30

A.  Rothman's Violations Of The Rothman Order Deprived FIS Of Its Benefits And
     Warrant The Imposition Of A New One-Year Non-compete Period ........................... 31

B.  Levy's and Debtdomain's Active Participation And Abetting Of Rothman's  Violations
     Of The Rothman Order Demand The Imposition Of A One-Year Ban On The Sale Of
     The Debtdomain Product ............................................................................... 31

C.  Defendants Should Be Required To Disgorge Profits  Gained Through The Violations
     Of The Rothman Order .................................................................................. 33

D.  FIS Should Also Be Awarded Attorneys' Fees And Costs .......................................... 34

Conclusion ...................................................................................................... 35

FILED UNDER PROTECTIVE SEAL PURSUANT TO PROTECTIVE ORDER

TABLE OF AUTHORITIES

**FEDERAL CASES**

*A.V. By Versace, Inc. v. Gianni Versace, S.p.A.*, No. 96 Civ. 9721, 2002 WL 2012618 (S.D.N.Y. Sept. 3, 2002) ................................................................................................................ 33

*Alemite Mfg. v. Staff*, 42 F.2d 832 (2d Cir. 1930) ........................................................................ 28

*Atlantic Recording Corp. v. BCD Music Group,* No. 08 Civ. 5201 (WHP), 2009 WL 1390848 (S.D.N.Y. May 7, 2009) ............................................................................... 24, 26, 33

*EEOC v. Local 28 Sheet Metal Workers Int'l Assoc.*, 247 F.3d 333 (2d Cir. 2001) ............. 27, 30

*Eli Lilly & Co. v. Gottstein*, No. 07-1107, 2010 WL 3168649 (2d Cir. Aug. 12, 2010) ............. 29

*Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 642 F. Supp. 2d 276 (S.D.N.Y. 2009) .......................................................................................................... 31, 34

*King v. Allied Vision, Ltd.*, 65 F.3d 1051, (2d Cir. 1995) ............................................................ 24

*Latino Officers Ass'n City of New York, Inc. v. City of New York,* 558 F.3d 159 (2d Cir. 2009) 24

*Levin v. Tiber Holding Corp.*, 277 F.3d 243 (2d Cir. 2002) ........................................................ 28

*Manhattan Indus. v. Sweater Bee By Banff, Ltd.*, 885 F.2d 1 (2d Cir. 1989) ......................... 30, 33

*Marsh USA Inc. v. Karasaki,* No. 08 Civ. 4195 (JGK), 2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008) .............................................................................................................................. 31

*McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 69 S. Ct. 497 (1948) ................................... 24

*N.A. Sales Co. v. Chapman Indus.*, 736 F.2d 854 (2d Cir. 1984) ................................................ 30

*N.Y. State Nat'l Org. for Women v. Terry*, 961 F.2d 390 (2d Cir. 1992) .................................... 29

*N.Y. State Nat'l Pref. Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) .............................. 24

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs.*, 369 F.3d 645 (2d Cir. 2004) ........................................................................................................................ 30

*Paramount Pictures Corp. v. Carol Pub'g Group,* 25 F. Supp. 2d 372 (S.D.N.Y. 1998), ........... 28

*Pearson v. Planned Parenthood Margaret Sanger Clinic (Manhattan)*, 507 U.S. 901, S. Ct. 1233 (1993) .............................................................................................................................. 29

*Regal Knitwear Co. v. NLRB*, 324 U.S. 9, S. Ct. 478 (1945) ...................................................... 29

*Shady Records, Inc. v. Source Enter.*, 351 F. Supp. 2d 64 (S.D.N.Y. 2004)................................. 24

*U2 Home Entm't v. Hong Wei Int'l Trading,* No. 02 Civ. 5828 (JFK), 2005 WL 3766976
  (S.D.N.Y. May 31, 2005)........................................................................................ 30

*Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, (2d Cir. 1979) .................................. 24

*Weitzman v. Stein,* 98 F.3d 717 (2d Cir. 1996). ........................................................... 34

## Preliminary Statement

Plaintiff Fidelity Information Services, Inc. ("FIS" or "Plaintiff") submits this memorandum of law in support of its request for an order holding defendants Seth Rothman ("Rothman"), David Levy ("Levy"), Debtdomain GLMS Pte Ltd. ("GLMS") and Debtdomain (USA) Inc. ("Debtdomain USA" and, together with GLMS, "Debtdomain") in civil contempt for their blatant and willful violation of the Order of this Court barring Rothman from competing with FIS for a one-year period ending September 12, 2008, and from disclosing FIS' confidential information ("Rothman Order"). (Debtdomain, Levy and Rothman are referred to collectively herein as "Defendants".)[1]

Defendant Levy was a founder of Customized Database Services, Inc. ("CDS"), the original developer of the SyndTrak software. CDS was acquired by FIS in 2003 for $18 million; some $9 million went to Levy. SyndTrak was at that time, and still is, the leading loan syndication software available on the market.

Defendant Rothman is a software developer, who worked for Levy at CDS as chief developer of SyndTrak. After FIS' acquisition of CDS, Rothman worked for FIS, and remained there until July 2007. At FIS, Rothman worked on virtually all aspects of the Syndtrak software, had a comprehensive knowledge about its design, and ultimately became the product manager for SyndTrak at FIS.

As discussed further below, in July 2007, Rothman left FIS and began working at an FIS competitor, Intralinks. FIS sued Rothman for theft of trade secrets, including source code.

---

[1] In this action, FIS asserts copyright claims arising out of Defendants' unauthorized and unlawful copying of valuable elements of FIS' SyndTrak front-office loan syndication computer software ("SyndTrak"), the incorporation of such misappropriated elements into a competing product, and the marketing of the infringing product to FIS' customers and potential customers. FIS also asserts unfair competition claims arising from Defendants' other wrongful conduct.

Rothman was subsequently fired by Intralinks.  He settled the lawsuit with FIS by entering into a settlement agreement so-ordered by this Court, which expressly barred him from working for any FIS competitor until September 12, 2008 and also reaffirmed prior confidentiality obligations that Rothman had agreed to while working at FIS.

By January 2008, Levy began negotiations to acquire an equity interest in Debtdomain, which produced a loan syndication product which competed with SyndTrak (the "Debtdomain Product").  Until then, Debtdomain had been unable to convince even a single SyndTrak customer to switch to Debtdomain.  Concurrent with his negotiations to buy into Debtdomain, Levy also became a consultant to Debtdomain, with the express intention of revising and marketing the Debtdomain Product so that it could effectively compete against FIS' SyndTrak. His chief design proposal was an upgrading of Debtdomain's program to be "SyndTrak-like."  To accomplish these goals, in early 2008 Levy recruited defendant Rothman.

However, as early as February 2008, Defendants were fully aware that Rothman was barred by the Rothman Order from competing with FIS until September 12, 2008.  In willful violation of the Rothman Order, Rothman threw himself into work for Debtdomain well before September 2008, participating in software development, market conferences, client data conversions and other activities which Debtdomain relied on to directly compete with FIS. Aware of the bar on Rothman's activities, Defendants took great pains to conceal Rothman's violations of the Rothman Order.  Debtdomain funneled its payments to Rothman through Tamarind Holdings LLC ("Tamarind"), an entity controlled by  Levy, who then funneled payments to Rothman through UGotAGeek, a company controlled by Rothman.  Efforts were also made to obscure Rothman's activities at Debtdomain by not naming him directly but instead

2

referring to him in e-mails as "he who must not be named," "he who shall remain nameless," and "you know who."

Discovery in this lawsuit has revealed that beginning in or about January 2008, and continuing through September 11, 2008, Rothman was employed by Debtdomain and by Levy as a consultant, and was paid tens of thousands of dollars to, among other things: (1) conduct work on Debtdomain's platform design, and make design recommendations to Debtdomain, using his encyclopedic knowledge of SyndTrak to do so; (2) work on the first, crucial, "data conversion" from a SyndTrak customer to a Debtdomain customer, the success of which was touted by Debtdomain as it aggressively sought to take other FIS customers; (3) help resolve a critical software security issue; (4) participate in a key internal marketing conference designed to make Debtdomain a more effective competitor to FIS (even drafting the official minutes); and (5) perform so-called "due diligence" on the Debtdomain Product in connection with David Levy's investment in Debtdomain. This was not "due diligence" in any ordinary use of the phrase. Instead it included the development of Debtdomain's software and its internal procedures to enable Debtdomain to compete against FIS.

Defendants' wrongful conduct has caused FIS profound damages. In fact, it is evident that without Rothman's active participation, and violation of the Rothman Order, Debtdomain would never have been able to compete effectively against FIS within the loan syndication market.

As set forth in Point I herein, where, as here, a party establishes that a contemnor like Rothman has violated a clear and unambiguous court order, a court should not hesitate to hold such a contemnor liable for civil contempt. Moreover, where others, with actual notice of the order, knowingly assist a contemnor in violating a court order, those other parties may also be

held liable for civil contempt.  In this case, Levy and the two Debtdomain defendants, with full knowledge of the Rothman Order, assisted, encouraged, and acted in concert with Rothman in his violations of the Rothman Order, and took measures to hide his participation.  They too should be held fully liable for the consequences of those violations.

As set forth in Point II herein, FIS respectfully requests that the Court impose appropriate contempt sanctions, including:  (a) a new, one-year noncompetition order barring Rothman from any employment by Debtdomain or any other competitor to FIS;   (b)   an order barring Debtdomain and Levy from selling, licensing or otherwise benefitting from the Debtdomain Product, since the Debtdomain Product sold today was developed following the time that Rothman began consulting for Debtdomain in or about May 2008, for one year;   (c)   the disgorgement of any profits earned by Debtdomain on sales of its products as well as disgorgement of Levy's and Rothman's profits and/or compensation; (d) an award of damages to FIS' business caused by Defendants' contempt; and (e) an award of the costs of this motion, including reasonable attorneys' fees.

## Statement of Facts Pertinent to Defendants' Contempt

**A.**   **Seth Rothman Gains a Comprehensive Knowledge of Syndtrak While at CDS and FIS**

David Levy was a founder of Customized Database Services, Inc. ("CDS"), the original developer of SyndTrak.  From 1998 to 2002, Rothman worked as the head developer of the SyndTrak software at CDS.  [See September 25, 2008 email from D. Levy to D. Roberts, attached as Ex. 1.][2]  CDS was acquired by FIS in 2003 for            of which Levy received some $9 million.  [See Ex. 2, Excerpts of Transcript of Richard Levy Deposition ("R. Levy Tr."),

---

[2]  All bracketed exhibit references herein ("[Ex.]" are to the exhibits to the accompanying Declaration of Mark H. Moore in Support of Motion for Contempt, dated September 22, 2010.

at 114:14-21, 166:2-3.] Rothman remained at FIS, ultimately becoming the SyndTrak Global Product Manager. [*See* Ex. 3, June 9, 2009 Letter from S. Tai to N. Pavey, at DD000419; *see also* Ex. 4, Excerpts of Transcript of Seth Rothman Deposition ("Rothman Tr."), at 267:16-24, 270:25-271:24.]

During his time at CDS and FIS, Rothman gained an intimate and thorough knowledge of SyndTrak. Levy used this knowledge to permit Debtdomain to compete effectively against FIS. Indeed, in an e-mail to Sean Tai, the founder and Co-CEO of Debtdomain, dated March 5, 2008, Levy touts Rothman's knowledge of SyndTrak:

> We [CDS] hired Seth in 1998 as a developer. He initially worked on LoanTrak [another CDS/FIS product] but soon moved to SyndTrak, and basically never left . . . . *Seth almost singlehandedly wrote version 2 [of Syndtrak] . . . and the early releases of version 3 . . . .* When we discovered that he also has an excellent customer service attitude and manner, we named him overall "Product Manager" for SyndTrak, which gave him responsibility for a small team of developers and BAs. In this role, he had extensive client contact and established excellent relationships with many key clients . . .

[*See* Ex. 5, March 5, 2008 email from D. Levy to S. Tai (emphasis added).]

Shortly thereafter, Sean Tai made it very clear that Debtdomain was going to leverage Rothman and Levy's knowledge of Syndtrak for technical and marketing purposes, when he told his team to tell Fortis Bank in an upcoming meeting that:

> 1. we now have the skills for data extraction.
>
> 2. *If there are any syndtrak like features that they need, we now have the knowledge to add it soon to DD Syndicator (and we are doing that anyway with the Syndtrak style investor /bookrunner screen).*

[*See* Ex. 6, March 8, 2008 e-mail from S. Tai to T. Skinner, at DD083425 (emphasis added).]

**B.    Rothman's Initial Confidentiality And
Noncompetition Agreement with CDS/FIS**

While at CDS, Rothman entered into a "Confidentiality, Work Product and Non-Competition Agreement" on or about October 4, 2002 (the "Rothman Confidentiality Agreement"). [*See* Ex. 7, Rothman Confidentiality Agreement.]

Section 1 of the Rothman Confidentiality Agreement provides that both during and after his employment with FIS -- *without any time limitation* -- Rothman was precluded from using or disclosing any company "Confidential Information" outside of his work for CDS (later FIS), without approval from the Company (or as required by law). "Confidential Information" is defined in the Rothman Confidentiality Agreement as "knowledge or information *not generally known to the public or in the information technology industry and shall include, without limitation*, (a) with respect to the Company, any source code to proprietary software systems, product plans, marketing plans, pricing information, client lists, prospects, business plans, forecast, strategies, and terms of Client contracts; and (b) with respect to Clients, any Client financial or customer information." [*Id.* at F0000761 (emphasis added).]    The Rothman Confidentiality Agreement also contained a one-year noncompetition clause. [*Id.* at § 8.]

**C.    Entry of the Rothman Order**

In July 2007, Rothman quit FIS and immediately joined IntraLinks, an FIS competitor, to develop a competing "customer relations management" ("CRM") product similar to SyndTrak. [Ex. 4, Rothman Tr. at 13:9-14:17.]    On August 31, 2007, FIS filed a lawsuit against Seth Rothman, accusing him of, *inter alia*, taking SyndTrak source code and other trade secrets. [*See* Ex. 8, Verified Complaint.]    Intralinks fired Rothman and Rothman entered into a settlement with

FIS, which was so-ordered by the Court on October 18, 2007 (the "Rothman Order"). [*See* Ex. 9, Rothman Order.]

As agreed to by Rothman, and so ordered by the Court, Rothman was required to continue to comply with the confidentiality provisions of the Rothman Confidentiality Agreement, unless modified by the Rothman Order:

> Rothman shall not use or disclose ACBS's [the division of FIS which markets SyndTrak] Confidential Information, as defined in Rothman's Confidentiality, Work Product, and Non-Competition Agreement (the "Agreement") and shall otherwise comply with the terms of the Agreement, except as may be modified by this Stipulation.

[*Id.* at § 2.] There are no such modifications.

In addition, Section 3 of the Rothman Order contained an explicit one-year noncompetition provision:

> Rothman shall not become self-employed, or solicit, accept, or retain employment with IntraLinks, Salesforce.com, the Navatar Group, or any business that competes with ACBS, by developing and/or selling software to persons or entities in the debt capital market, until after September 11, 2008. Rothman will provide ACBS with 5 business days' notice of intention to accept the employment with any entity.

[*Id.* at § 3.] Thus, by his own agreement and Court order, Rothman was barred from working for, or even soliciting employment from, any company which competed with FIS by selling or developing loan syndication software. Debtdomain was a direct competitor to SyndTrak during 2008. [Ex. 10, Excerpts of Rough Transcript of Sean Tai Deposition, dated September 14, 2010 ("Tai Rough Tr."), at 85:19-86:1, 135:15-19; Ex. 11, April 7, 2008 email from D. Levy to M. Efird at DD052593 ("Debtdomain, which competes directly against SyndTrak and Intralinks.").]

## D.   David Levy Approaches Debtdomain

After selling CDS, Levy joined FIS for a time, but left FIS' employ on April 15, 2005. [Ex. 12, Excerpts of Transcript of David Levy Deposition ("D. Levy Tr."), at 9:2-6.]

By January 2008, Levy had approached Debtdomain to discuss generating a $1 million equity investment in Debtdomain and joining Debtdomain as a full time executive with the company. [*Id.* at 32:7-21; 35:17-38:21; *see also* Rothman Tr. 12:2-13; 15:8-22; 77:16-79:24; *see also*, Ex. 13, March 23, 2008 Letter from David Levy to Andrew Korner, at DD014421-22.]

However, Levy's interest in Debtdomain was not simply as an investor. At the same time he was negotiating to buy into Debtdomain, Levy was also acting as a consultant to help Debtdomain compete with SyndTrak. A February 9, 2008 e-mail from Sean Tai described Levy's consulting work as follows: (1) work with Debtdomain to "set up and conduct sales meetings with loan syndication and trading market participants in the US and Europe"; (2) review the Debtdomain Product and advise on "modifications and enhancements"; (3) advise with respect to new products; (4) develop a methodology for easily migrating data out of SyndTrak 3.0 or 3.1 to Syndicator (then the name for the Debtdomain Product); and (5) assist the company in setting up the operations of its U.S. subsidiary. [Ex. 14, February 9, 2008 email from S. Tai to A. Korner, at DD073434-35; *see also* Ex. 15, February 6, 2008 email from D. Levy to S. Tai, at DD073361-62; Ex. 16, Draft Debtdomain Consulting Agreement.]

Levy agreed to a monthly consulting rate of $18,750 and performed the above tasks for Debtdomain over the period of February 2008 through September 2008. [Ex. 17, Excerpts of Transcript of Deposition of Tamarind Holdings LLC ("Tamarind Tr."), at 26:3-32:4, 78:12-79:12.] From April 2008 through September 2008, Debtdomain paid $64,937.50 for this consulting work. [*See* Ex. 18, invoices with entries such as "consulting from 4/15/08 through 4/30/08 per agreement" and "management consulting"; *see also* Ex. 17, Tamarind Tr. at 77:22-80:4, 82:18-83:7, 84:17-85:5; *see also*, Ex. 12, D. Levy Tr. at 49:16-50:10.]

At the time Levy presented himself to Debtdomain, Debtdomain was viewed in the industry as a "very small shop." [Ex. 4, Rothman Tr. at 20:19-22:22 (describing IntraLinks' assessment of Debtdomain).] As of May 2008, Debtdomain had been unable to convince even one SyndTrak user to convert to Debtdomain. [*See, e.g.*, Ex. 13 at DD014414 ("Debtdomain has *never* supplanted SyndTrak as the CRM/bookrunning system at a firm where SyndTrak was already installed.") (emphasis in original).] Moreover, Debtdomain's "lack of resources to invest in product development and marketing also imperils the company's emerging competitive position." [*Id.* at DD014413.] Garry Viner ("Viner") and David Lawrence ("Lawrence"), the original developers of the Debtdomain Product, lacked "real world business exposure," which hampered their ability to develop a competitive system. [Ex. 4, Rothman Tr. at 57:2-59:17.] Prior to Levy's and Rothman's involvement, "[D]evelopment [at Debtdomain was] . . . managed very badly," and Viner was "massively under resourced and this [continued] . . . to get worse and worse and worse." [Ex. 19, July 15, 2008 email from D. Lawrence to S. Tai, at DD082160.]

E.      **David Levy's Plans To Compete Against
        SyndTrak by Making Debtdomain's Product "SyndTrak-Like"**

By March 2008, Levy had helped develop a plan to make Debtdomain a serious competitor. Drawing upon his experience and knowledge gained at CDS and FIS, Levy, with Rothman's assistance: (1) performed a comprehensive analysis of Debtdomain's business, and its competitors; (2) analyzed Debtdomain's product and its functionality; (3) identified the "functionality gaps" between SyndTrak and Debtdomain; (4) identified which customers of SyndTrak also used its LoanTrak product; (5) identified competitive weaknesses of SyndTrak; (6) created a "business plan" for Debtdomain for its competition with SyndTrak and Intralinks ("So how do we beat SyndTrak?"); and (6) concluded that to compete with FIS, Debtdomain's

"CRM" function had to be updated to be "SyndTrak-like." [Ex. 13 at DD014412-21, in particular, at DD014420 ("I do not believe that the summer release will have sufficient SyndTrak-like functionality to be a credible replacement at hard-core US leveraged shops . . . . However, the winter 2008/09 release is doable to achieve sufficient SyndTrak-like functionality"); *see also*, Ex. 12, D. Levy Tr. at 119:13-120:11.] To fund the development of the "SyndTrak-like" functionality, Levy offered to invest or raise approximately $1 million, and to act as co-CEO of the company. [Ex. 13 at DD014420 and DD014422-24.]

**F.**   **Debtdomain and Levy's Full Knowledge of the Rothman Order**

After Levy left FIS, he remained in touch with Rothman, and discussed FIS' prior lawsuit against him. [*See, e.g.*, Ex. 12, D. Levy Tr. at 14:18-15:2; 17:15-25; 19:1-25.] When Levy began his discussions with Debtdomain, he and Rothman immediately discussed the possibility that Rothman would join Debtdomain. [*See* Ex. 14 at DD073435 (as of February 9, 2008, Rothman "seem[ed] keen to help David [Levy] with DD [Debtdomain]").] Levy was fully aware of the Rothman Order and its restrictions on Rothman's employment. Rothman informed Levy that in connection with the settlement of FIS' lawsuit against him, the Court had issued an order containing a non-competition provision. [Ex. 12, D. Levy Tr. at 104:20 – 107:17; see also, Ex. 9.] Rothman told Levy about the Rothman Order in November 2007 or shortly thereafter. [Ex. 4, Rothman Tr. at 151:9-152:21 ("certainly was not . . . months" after the settlement with FIS that Rothman told Levy about the FIS lawsuit.)]

Debtdomain also knew full well about the Rothman Order and the restrictions it placed on Rothman. Not only did Levy advise Tai, CEO of Debtdomain, about the Rothman Order "to make sure he was aware of it" [*see, e.g.*, Ex. 12, D. Levy Tr. at 107:16-17; Ex. 17, Tamarind Tr.

at 39:10-20], but Tai himself wrote in a February 9, 2008 email to Debtdomain's key personnel that:

> Seth Rothman had signed an NDA [non-disclosure agreement] with DD [Debtdomain] but *cannot start working in any capacity (or be paid ) until his non-compete expires in Sept[ember] 2008.*

[Ex. 14 at DD073435 (emphasis added)]; Ex. 10, Tai Rough Tr. at 84:2-8, 117:3-10 (Tai's understanding in that regard never changed); Ex. 17, Tamarind Tr. at 39:10–23 (confirming Levy's and Tai's discussion of the Rothman Order by February 2008).]

## G.    Rothman's Work for Levy and Debtdomain Violates the Rothman Order

In June 2008, Rothman traveled to Australia for two weeks, to conduct what was described as "technical due diligence" for Levy on the Debtdomain software, including a review of its source code and "underlying architecture" and its "suitability as a competitive vehicle" against SyndTrak.  [Ex. 12, D. Levy Tr. at 95:1-23, Tr. 103:5-12; Ex. 4., Rothman Tr. 23:21-24:3, 25:25-26:7.]  Rothman was charged with determining if the state of the software was a "deal killer."  [Ex. 12, D. Levy Tr. at 98:5-99:2; Ex. 4, Rothman Tr. at 23:17-24:3.]  Rothman ultimately concluded that it was safe for Levy to make his investment.  [Ex. 12, D. Levy Tr. at 98:5-99:2; 114:1-17.]  Levy admitted that he relied on Rothman's work in making his decision to invest in Debtdomain.  [*Id.* at 114:13-17.]   As detailed in Point I below, Rothman's "due diligence" work in and of itself violated the Rothman Order.  However, Rothman's work went *far* beyond mere due diligence.  Instead, from February through September 2008, Rothman did significant work for Debtdomain on software development, technical troubleshooting, data conversion, and marketing, always relying upon his intimate knowledge of SyndTrak and FIS.

Fully aware of their misconduct, Defendants attempted to hide Rothman's work for Debtdomain trying not to use Rothman's name in internal emails, instead using references such

as "he who cannot be named." [*See, e.g.*, Ex. 20, May 22, 2008 email from S. Tai to B. Paajanen, at DD014872 ("See notes from you know who," who is revealed as "Seth" in embedded reply email from B. Paajanen to Tai); Ex. 21, February 29, 2008 email from S. Tai to B. Paajenen (stating "He who can not be named thought the Agilon thing could work"); Ex. 22, April 30, 2008 email from B. Paajanen to D. Levy, at DD052466 (bearing the subject line "Names at PNC to go through with he who shall remain nameless"); Ex. 23, June 4, 2008 email ("I spoke to Syndey (Garry and he who can not be named) and they wanted extra time for the data migration."); Ex. 24, June 10, 2008 email regarding Citi (Citibank) ("Lawrence, Garry Viner and others who shall not be named" should consider ideal approach).]

The Defendants also took active measures to obscure Rothman's true activities at Debtdomain, in the way they billed and paid for his work. Rothman would submit an invoice through his company, UGotAGeek, LLC, to Levy's company Tamarind. Then Tamarind would submit a matching invoice to Debtdomain. [Ex. 4, Rothman Tr. at 28:23-29:8; Ex. 17, Tamarind Tr. at 70:14-25, 82:18-84:25, 86:12-18; Ex. 18, at T000003-7.]    When Debtdomain paid Tamarind, Tamarind then paid UGotAGeek, which then paid Rothman. Thus, for example, Debtdomain paid Rothman (through his company, UGotAGeek, LLC) $12,000 for his work in Australia. [Ex. 12, D. Levy Tr. a 99:3-23.]

1.    **Rothman Worked with Debtdomain on Marketing and Strategy.** In an e-mail dated February 9, 2008, Tai noted that Rothman was going to be participating in a "US strategy meeting" on February 12, 2008 – despite the existence of the Rothman Order's non-competition provisions. [Ex. 14 at DD073435.]    Tai highlighted the important fact that "Seth Rothman's knowledge of SyndTrak/ACBS [wa]s fairly current – he only left in Sept[ember] 2007." [*Id.*] Rothman was also actively involved in early 2008 in developing the marketing approach to BNP

Paribas (a SyndTrak customer). A March 5, 2008 e-mail from Levy states that Rothman was meeting with the Debtdomain team to provide strategy and insights into providing a "CRM" product to that bank. [Ex. 25, at DD065172-73.]

Still further, Rothman, along with Levy, Tai, and Tim Skinner and Bob Paajanen from Debtdomain, attended the "Debtdomain Inaugural Sales Conference" on May 19-20, 2008, where Rothman himself took the notes of the conference. [*See* Ex. 20, DD014872-79.] The conference focused on, among other things: (1) why clients had been reluctant to work with Debtdomain; (2) the need for an improved CRM function; (3) vulnerabilities of the ACBS division of FIS, where Levy and Rothman had worked and; (4) future contacts with clients, including a number of SyndTrak users. [*Id.* at DD014873-79.]

When confronted about this conference during depositions, the Defendants each suffered from a failure of recollection. Rothman repeatedly perjured himself, during his deposition, when he stated that he could not recall the two-day conference at all, much less taking minutes, despite extensive questioning as to every aspect of the conference. [Ex. 4, Rothman Tr. at 81:23 – 97:9 (twenty-nine purported failures of recollection about a two-day meeting for which Rothman took the notes).] Levy did not hesitate to perjure himself either, testifying that he recalled every participant at the meeting being there, but could not recall if Rothman, his key confederate, was present. [Ex. 17, Tamarind Tr. at 49:14-50:17.] Likewise, Tai testified that he attended the meeting and recalled every participant except Rothman. [Ex. 10, Tai Rough Tr. at 157:1-160:23.]

Following Rothman's deposition, and his blanket "don't remembers," Defendants refused to produced the native version of the meeting minutes notes and FIS was forced to move to compel their production. [Ex. 26, Transcript of July 28, 2010 Telephone Conference with Judge

Kevin N. Fox, p. 31:8-14.] Not surprisingly, the "meta-data" contained in the native file explicitly states that the author was "Seth Rothman." [Ex. 27, Pinpoint Metaviewer screen shot.][3]

  **2.**  <u>**Rothman Also Worked on Data Conversion for Debtdomain.**</u> Prior to the expiration of the September 11, 2008 non-compete in the Rothman Order, Levy enlisted Rothman to assist in the conversion of data from customers of SyndTrak who switched to Debtdomain. Data conversion is the "process of taking the client's historical data from one system and using it to populate another." [Ex. 12, D. Levy Tr. at 199:2-4.] In order to perform the task, the data is extracted from the "SyndTrak database," and is sent to Debtdomain, which would run programs to "map their data to our data fields." [*Id.* at 200:4-9; *see also* Ex. 28, December 26, 2008 email from S. Tai to ING (showing steps in data transfer).]

  Rothman's "deep understanding" of the SyndTrak system gave him an "advantage" in converting data, and Rothman could "definitely do it faster than a person coming in cold." [Ex. 12, D. Levy Tr. 93:19-21, 200:2-201:2; *accord* Ex. 10. Tai Rough Tr. at 111:7-19 (it was an "advantage" having Seth work on conversions because of his knowledge of the "SyndTrak database schema").] In fact, Rothman worked on the development of the SyndTrak "schema" where data was stored by the SyndTrak clients. [Ex. 4, Rothman Tr. at 117:16- 119:24, 123:22-24 ("knowing the schema, there's less of a learning curve to figure out where things are stored").] Moreover, customers making the switch from SyndTrak to Debtdomain would trust him more than others to perform this work. [Ex. 12, D. Levy Tr. at 93:22-94:5.]

---

[3] In response to the Court's order, Debtdomain produced the native version of DD014873-79 (Ex. 20) as a Microsoft Word file "DD014873.doc." This file was saved to a local drive and "Pinpoint Metaviewer" software was used to read the "OLE metadata" stored in the metafile. Exhibit 27 is a screen shot of the data from the native file showing that the document produced by Defendants as DD014873-79 (Ex. 20) was authored by Seth Rothman. *See* Decl. of Mark H. Moore, ¶ 28.

The first client to leave SyndTrak for Debtdomain was Unicredit (also known as "HVB"). Thus, this was the very first time that Debtdomain conducted a data conversion from SyndTrak, and time was of the essence. [Ex. 4, Rothman Tr. at 93:3-25.] Rothman was a key participant in the technically challenging and cumbersome task of converting the data from the SyndTrak database into the Debtdomain Product. Although Rothman testified that he could not recall when this data conversion occurred [*Id.*], the documents produced by Defendants indicate that Rothman's work on the data conversion was in full swing by the summer of 2008 – the very time prohibited by the Rothman Order:

- June 4, 2008 e-mail from Levy to Rothman: "I want to discuss the pipeline functionality and the HVB data conversion, *which we have to do this summer.*" [Ex. 29 (emphasis added).]

- June 24, 2008 e-mail from Tai to HVB representative Gary Langton, with cc: to others and bcc: to Rothman, setting up a database migration conference call and indicating that "One of our SyndTrak data specialists will be on the call"; follow-up e-mail from Tai only to HVB with bcc: only to Rothman, declining to identify the SyndTrak data specialist, and saying only that "he will introduce himself on the call." [Ex. 30 at DD058607-08 and DD058611.]

- June 29, 2008 e-mail from Tai requesting Rothman's comments on questions from HVB about data conversion so that Debtdomain can give answers to HVB. [Ex. 31 at DD058634.]

- July 15, 2008 e-mail from Viner to Tai responding to an inquiry from HVB about the data conversion and a Friday deadline, explaining that "as far as the Friday deadline is concerned, we are having a horrific time. I have spent all my time this week on this, *as has Seth*, working at ridiculous times of the day while we are both sick, and we are continuing to come up against problems." [Ex. 19 at DD082161.]

- July 23, 2008 e-mail from Levy to Tai, Viner, Lawrence and Rothman regarding HVB Data conversion meeting: "This is probably a big job. Let's discuss together. Seth can explain what SyndTrak does, and then we can consider our course of action." [Ex. 32.]

- June and July 2008 invoices from Tamarind to Debtdomain billing Debtdomain for work Rothman did for "consulting relating to Debtdomain technical review and data conversion" and transmittal e-mail from Levy to Tai explaining, *inter alia*, that Levy "logged a significant amount of time on data conversion with Seth". [Ex. 18 at T000004-T000005; Ex. 33 at DD065911.]

And the mountain of evidence of Rothman's work in helping to convert HVB/Unicredit goes on.[4]

**3.** **Rothman Worked to Debug Critical issues in Debtdomain's Software.** In June 2008, the Debtdomain Product developed a security bug at Citibank, and Citibank was so troubled by the incident that it threatened to leave Debtdomain. [*See* Ex. 41, June 10, 2008 email from D. Levy to S. Tai.] When the bug developed, Garry Viner worked with Rothman and Levy to attempt to locate the problem, "going through the process with a fine tooth comb". [*Id.* at DD050808; *see also,* Ex. 42, June 10, 2008 e-mail from G. Viner to S. Tai stating that "David, Seth and I [Viner] spent a combined total of 4 man hours on this [the Citibank bug] yesterday"); Ex. 43, June 11, 2008 G. Viner email stating that "[c]learly David [Lawrence], Seth [Rothman] and I will have to spend/waste more time that we do not have tomorrow to come up with a suitable explanation.").] Rothman helped with other software developments as well. [*See* Ex. 44, August 27, 2008 email (reflecting Rothman's work on addressing bug on Debtdomain's "bookrunning" page).]

**4.** **Rothman Worked on "Pipeline Management" Features.** Pipeline management is the organization of information about all of the deals which a client either has in the market or is "pitching". [Ex. 4, Rothman Tr. at 106:23-107:23.] In or about June 2008, Rothman actively

---

[4] [*See* Ex. 4 Rothman Tr. 127:2-128:2 (as of June 2008, Rothman was consulting "in-depth" with respect to data conversion); Ex. 34, June 9, 2008 email from S. Rothman to S. Tai and D. Levy, at DD047353 (referring to "HVB"); Ex. 35, June 27, 2008 email from S. Rothman (describing his conversation with HVB on data conversion issues); Ex. 36, June 28, 2008 e-mail from S. Rothman to S. Tai (transmitting list of deals in HVB's "SyndTrak database"); Ex. 37, July 9, 2008 e-mail from S. Rothman to S. Tai (providing advice on importing data from SyndTrak); Ex. 38, July 9, 2008 email from S. Rothman to S. Tai and G. Viner (advising on loan status categories); Ex. 39, July 22, 2008 e-mail from S. Rothman to S. Tai, at DD059769 (suggesting approach for categorizing deals based on practice using SyndTrak); Ex. 40, June 24, 2008 email from S. Tai to G. Langton, at DD058602 ("We are devoting significant resources to this [data conversion] project including people who are intimately familiar with the SyndTrak system."); Ex. 31, at DD058634 (e-mail from D. Levy to S. Tai and S. Rothman with the subject "RE: HVB Data Conversion email" inquiring about inactive deals in SyndTrak); Ex. 32 (e-mail from D. Levy to Tai and Viner, copying S. Rothman, with the subject "RE: HVB Data Conversion meeting").]

participated in the design and improvement of the pipeline management function at Debtdomain. [Ex. 45, June 10, 2006 email from S. Rothman to S. Tai, at DD013865 (stating "Gary and I reviewed the spec in a whole lot more detail . . ."; lengthy analysis of the pipeline function by Rothman, including comparisons to SyndTrak, commented on by Tai and Levy); *see id.* at D013866 ("I think the appropriate structure is basically what we built in SyndTrak"); *see also,* Ex. 4., Rothman Tr. at 128:22-130:13; Ex. 40 at DD058602; Ex. 46, July 1, 2008 email from S. Rothman to G. Viner (comparing approach used by Debtdomain to the "pipeline report in SyndTrak").]

### 5.   Rothman Also Evaluated Programs to Manage Software Development.

Rothman was an active participant in the evaluation of "development tracking software" for Debtdomain.  A development tracking system enables the user to track work tickets for software development.  [Ex. 4, Rothman Tr. 43:22-44:13.]   In May 2008, Rothman "conducted an analysis" of tracking systems and the system eventually selected was the JIRA system.  [*Id.* at 45:15-48:25; *see also* Ex. 47, May 1, 2008 email from S. Rothman to D. Levy, D. Loxton and D. Lawrence, at DD014050-51 (showing Rothman's analyses of alternative systems).]   In June 2008, Rothman and Levy were given JIRA passwords to gain access to the system.  [Ex. 48., May 22, 2008 email from D. Loxton to D. Lawrence; see also Ex. 4, Rothman Tr. at 74:3-19.] On June 4, 2008, Levy suggested he and Rothman draft a "basic outline" for "the business process we want to implement at DD [with respect to software development, and t]hen we'll configure the [JIRA] system to the process." [Ex. 49, June 4, 2008 email from D. Levy to S. Tai.]  To that end, Levy said that he and Rothman would "take the best of the various practices we used at CDS."  [*Id.*]

**6.     Rothman Helped With Other Technical Fixes and Software Enhancements During His Noncompete Period, As Well.**

Evidence of Rothman's other technical work includes: Ex. 33 (on July 16, 2008, Levy refers to his internal meetings with Seth "on technology and development issues"); Ex. 44 (on August 27, 2008, Rothman helps with sort order problem); Ex. 39 (August 27, 2008, Rothman helps with status date issue in deal profiles); *see also*, Ex. 50, November 18, 2008 email from S. Rothman to D. Levy, at DD037314 (on November 18, 2008: Rothman provides input into BNP conversion, stating, "That's all we provided in SyndTrak so I think we should be ok.").

**7.     Rothman Worked to Develop Debtdomain's Data Model.** Rothman was an active participant in the development of a "data model" for Debtdomain. A data model is a framework (or "schema") for the database that stores information in a computer system. When Rothman observed that Debtdomain's developers lacked real world business experience, he pointed out the "flaws" in Debtdomain's system to Debtdomain. [Ex. 4, Rothman Tr. at 56:4-60:10; *see also* Ex. 12, D. Levy Tr. at 114:25- 115:23.]

Thus, it is evident that Rothman was extensively involved in the marketing, development, and troubleshooting of the Debtdomain Product before the expiration of the Rothman Order's non-compete on September 12, 2008.

**H.     Rothman Worked with Viner to Develop The Infringing "Syndtrak-Like" "Notes" Screen**

Rothman's work from February 2008 through September 2008 paved the way for the most egregious act against his former employer: the duplication of the key "main page" of the SyndTrak system. As stated in the Expert Report of Charles L. Mauro (the "Mauro Report"), the "main screen" of the SyndTrak system is the key element in its use by the loan syndication industry. [Ex. 51, Mauro Report, at pp. 7-8.] Indeed, at least one customer selected

Debtdomains' system based solely on the seeing the new Notes Page in the Debtdomain Product. [Ex. 52, March 9, 2009 email from Debtdomain Syndication to T. Skinner.]

Rothman finally became "officially" employed by Debtdomain in September 2008. In October 2008, Debtdomain flew Garry Viner, Debtdomain's chief programmer for the past eight years from Australia to New York so that Viner could work "side by side" with Rothman to develop the new "notes page", which copied the main screen of FIS' SyndTrak program. [Ex. 12, Rothman Tr. at 171:19-179:17.]

The result was a nearly identical copy of FIS' SyndTrak Notes page and other important screens and reports. As Levy later put it: "Since my team (including the former head developer of SyndTrak) joined last year, we have completely overhauled our CRM, call note and pipeline functionality to the point where it is now considered a suitable replacement for SyndTrak. In fact, we built a "SyndTrak" view that makes the transition to DD easy for former ST clients". [Ex. 53, June 10, 2009 Letter from D. Levy to K. Katz, at DD040641; Ex. 12, D. Levy Tr. at 157:7-161:10.]

A Debtdomain marketing document produced by Defendants trumpets Rothman's role as the "former head developer of SyndTrak." Ex. 54, at DD043376. Debtdomain states that the "team that built SyndTrak/LoanTrak [including Rothman] has joined Debtdomain and invested in Debtdomain." [*Id.*] Finally, the document states that "this team has overseen the developments of Debtdomain's new 'Notes page' with functionality similar to SyndTrak." [*Id.*]

While Debtdomain's software expert testified that there was a "very, very, very large number" of ways that the information on on the notes page could be arranged [Ex. 55, Excerpts of Deposition of Benjamin Bederson ("Bederson Tr.") at 172:18-173:3], Debtdomain moved away from its old notes page and produced one for the Debtdomain system that was virtually

19

identical to the FIS "notes page." *Compare* Ex. 56, Debtdomain screen with Ex. 57, SyndTrak

screen; *see also*, Ex. 12, D. Levy Tr. at 121:10-122:18, 189:24-190:17 ("side by side"); Ex. 4,

Rothman Tr. at 171: 4-173:25.]   Levy placed no limitation on Rothman "with respect to

information he could use from Fidelity in helping to develop the new Notes page." [Ex. 12, D.

Levy Tr. at 194:11-15.]  Indeed, Levy and Rothman used SyndTrak as a "reference point" for the

development of the new screen.  [*Id.* at 195:16-196:23; *see also*, Ex. 58, October 18, 2008 email

from S. Rothman to S. Tai (showing that Rothman called upon his knowledge of SyndTrak

during October design sessions).]

     In direct violation of the Rothman Confidentiality Order, during the process of n

"overhauling" the Debtdomain software, as Levy put it, Rothman provided Viner with detailed

information about how SyndTrak operates.  As Rothman testified:

> Q. Did you provide him [Viner] with information about how SyndTrak operates?
>
> A. Yes.
>
> Q. What short of information did you provide him?
>
> A. In order to effectively – in order to be an effective tool for somebody in this market, certain things need to occur.  So we discussed at length what those things were.  For example:  Being able to quickly switch between deals, quickly switch between investors, quickly switch between contacts, write down typing commentary and post those call notes across those three entities.
>
> Q.  Did you provide him with this sort of information while he was making those enhancements to the new Notes Screen?
>
> A. Yes.

[Ex. 4, Rothman Tr. at 173:8-25; *see also*, *id.* at 218:5-219:18; Ex. 59, December 24, 2008 email

from S. Rothman to S. Perry, at DD023973 (Rothman states, "Second, we are planning to modify

the way deleted users/contacts are handled within the system (similar to SyndTrak).").]   Even

Levy conceded the new Debtdomain screen is "similar in look" to SyndTrak; he also admitted that approximately five potential customers for Debtdomain's product thought so as well.  [Ex. 12, D. Levy Tr. at 133:2-24.][5]

## I.    Debtdomain Markets Rothman to Potential Customers as a Key Resource To Ensure Smooth Conversions of SyndTrak Data

The successful data conversion by Rothman, which began during the period of his non-compete, was absolutely necessary for Debtdomain to compete against SyndTrak.  In fact, a key factor in Debtdomain's pitch to potential customers was the availability of Rothman to convert data from the Syndtrak system to Debtdomain.  For example, in a proposal to Royal Bank of Scotland plc, dated May 19, 2009, Debtdomain stated:

> *Because our group now includes the team that developed and introduced SyndTrak,* we can transfer all your deal, investor and contact data from SyndTrak to Debtdomain.  When you start using Debtdomain it will have all your SyndTrak history in it.

[Ex. 61, at DD045377 (emphasis added).]  The document continues:

> All deal, investor and contact history can be extracted from SyndTrak and imported to Debtdomain. Debtdomain has written computer scripts to automatically perform the data conversion.

> Seth Rothman was formerly the Global Product Manager for SyndTrak for nine years and joined Debtdomain last year. Seth will be in charge of the data migration project (details below) and can extract historical data without client or legacy vendor involvement.

> Since September 2008, Debtdomain has completed SyndTrak/Intralinks conversions for BNP Paribas, HSBC, ING, Unicredit, UBS, Mizuho, Fortis and Bayern LB. In addition, SyndTrak/Intralinks conversions are contracted for BOTM and other banks over the next few months.

---

[5]  The importance of the new "Notes page," developed with Rothman's participation, was front and center in a handbook put together by ING, a former SyndTrak customer which had switched to Debtdomain. ING created a "User Guide" for the Debtdomain product that described the new Notes page, in pertinent part: "**Notes**: this is the *Syndtrak*-style homepage. This is constantly getting improved at the moment to achieve a similar look and feel to what we experience on *Syndtrak*." [Ex. 60, at DD 029745 (emphasis in original); Ex. 12, D. Levy Tr. at 171:4-10, 177:11-22 (Levy describes such manuals as a "wonderful thing").]

[*Id.* at DD045379; *accord* Ex. 21 (Tai instructing Tim Skinner to tell BNP that Debtdomain has "<u>a former Senior SyndTrak technician available to do the data conversion</u>. [BNP] should see this as a <u>major risk mitigator</u> for the exercise.") (emphasis added); Ex. 62, at DD013925 ("Such consultants know the database schema and can extract the data without client or legacy vendor involvement"); Ex. 63, September 2, 2008 email from S. Tai to P. Fuller (touting Debtdomain's "knowledgeable consultants who . . . know the SyndTrak schema and can extract without client or legacy vendor involvement").] Because of his "deep understanding" of the SyndTrak system, Rothman participated in the data conversion for every customer of SyndTrak that switched to Debtdomain. In that way, Debtdomain built its business, and as a result, Fidelity has lost numerous customers to Debtdomain and may lose even more. [Ex. 2, R. Levy Tr. at 15:9-21.]

## J.     <u>Debtdomain Views Levy and Rothman as Critical to its Survival</u>

At the same time that Rothman was steadfastly violating the court order forbidding him from working for Debtdomain before September 11, 2008, Debtdomain was stressing behind the scenes that it faced dire consequences as a company if Levy and Rothman did not join Debtdomain. Commenting on the negotiations between Levy and Debtdomain for an equity interest, Lawrence, Debtdomain's director and Chief Technology Officer, stated: "After 8 years of very slow growth and many stressful times the loss of Levy would be crushing to us and we [Garry Viner and Lawrence] would certainly give notice on our contract [with Debtdomain] (which requires one year.)" [Ex. 64, June 16, 2008 email from D. Lawrence to T. Skinner, at DD075612.] In a similar vein, in an e-mail dated June 19, 2008, Skinner noted to Tai that he should push for a deal because "Levy & Co. – *and particularly emphasize Seth [Rothman]* – bring something to the party that we could never hope to replicate, without which we cannot

hope to unseat Syndtrak from current subscribers using HVB as the lead – but only the lead – example." [Ex. 65, June 19, 2008 email from T. Skinner to S. Tai. (emphasis added).]   Indeed, Debtdomain's David Lawrence concluded after meeting with Rothman that Rothman and Levy had skills which "outstrip all of ours no question." [Ex. 64, at DD075612.]

Indeed, Sean Tai prepared a valuation in June 2008 showing what Levy's and Rothman's contribution would mean to the company as a whole. [Ex. 66, June 17, 2008 email from S. Tai to T. Skinner, at DD075622-25.] The total value was estimated at $25 million over three years. [*Id.* at DD075625.]  Rothman's value alone was estimated at $300,000 immediately in light of the HVB conversion, another $7.5 million over 12-18 months, and another $7 million over the subsequent 18 months, for a total of $14.8 million. [*Id.* at DD075624-625 (lines 6-9).]

For all these reasons, Debtdomain viewed Levy and Rothman as mission-critical assets for the future. All of the Defendants had strong incentives for Rothman to do whatever was necessary to bring Debtdomain's product up to the level where it could compete against SyndTrak and to get the first SyndTrak client – even if it meant disregarding the Rothman Order – which is exactly what happened.

## Argument

### POINT I

### THE DEFENDANTS SHOULD BE HELD IN CIVIL CONTEMPT FOR THE REPEATED VIOLATIONS OF THE ROTHMAN ORDER

**A.    Rothman Should Be Held In Civil Contempt For His Repeated And Willful Violations Of The Rothman Order**

Civil contempt requires the "movant [to] establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and

convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Latino Officers Ass'n City of New York, Inc. v. City of New York,  558 F.3d 159, 164 (2d Cir. 2009)* (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)). However, "[i]t is not necessary to show that defendants disobeyed the district court's orders willfully." *Shady Records, Inc. v. Source Enter.*, 351 F. Supp. 2d 64, 66 (S.D.N.Y. 2004). Indeed, the "fact that the prohibited act was done inadvertently or in good faith, . . . does not preclude a citation for civil contempt . . . ." *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 129 n.2 (2d Cir. 1979) (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S. Ct. 497, 499-500 (1948)).   Because Rothman has not diligently attempted to comply with the clear and unambiguous Rothman Order, and proof of his non-compliance is clear and convincing, he should be held in contempt.

### 1.    Rothman Clearly Violated His Obligation Under The Rothman Order Not To Compete With FIS Before September 11, 2008

As a threshold matter, the Rothman Order's injunction is clear and unambiguous, and specific and definite enough to apprise Rothman and others of the conduct that is being proscribed. *See Atlantic Recording Corp. v. BCD Music Group,* No. 08 Civ. 5201 (WHP), 2009 WL 1390848, at *8 (S.D.N.Y. May 7, 2009) (quoting *N.Y. State Nat'l Pref. Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989)).

Section 3 of the Rothman Order contains a patently unambiguous one-year noncompetition provision.  Plain and simple, it precluded Rothman until <u>after</u> September 11, 2008 from becoming self-employed or soliciting, accepting, or retaining employment, *inter alia*, with any business that competes with FIS, by developing and/or selling software to persons or entities in the debt capital markets.  [Ex. 9, § 3.]  That, of course, includes Debtdomain.

24

Rothman nevertheless violated Section 3 of the Rothman Order in several ways.  First, he conducted what he and the other defendants called "technical due diligence" work in June 2008 on the Debtdomain software.  [See Statement of Facts ("SOF"), Section G, and citations therein.] That work included a review of the Debtdomain source code, the "underlying architecture," and its "suitability as a competitive vehicle" against FIS' SyndTrak.  Thus, regardless how Rothman tries to characterize it, that work analyzing the competitive Debtdomain Product – whether done directly for Debtdomain or to assist David Levy in evaluating an investment in the owner of that competitive product – was clearly work for a business competing with FIS in developing and/or selling competing software.

Second, during this period, Rothman was barred from even "soliciting" employment with a competitor, which he decidedly did.  [Ex. 9, § 3.]

Third, and most importantly, through his pre-September 12, 2008 work for Debtdomain, Rothman actively and directly participated in numerous ways outlined in detail above in the development and marketing of the competitive Debtdomain Product, always relying on his intimate knowledge of SyndTrak and FIS.  [See SOF §§ F, G, H, and J, and citations therein (citing, for example, Rothman's Debtdomain-related work on marketing, including critical marketing and sales meetings; essential migration and conversion of SyndTrak data from former SyndTrak customers; evaluating Debtdomain development tracking software; developing a "data model"; designing/improving pipeline management function; debugging customer software; and other work developing the Debtdomain Product).]  In short, as David Levy admitted, Rothman worked hand-in-hand with Debtdomain's Lawrence and Viner to work through "technology and development issues" involving the Debtdomain Product.  [Ex. 33, at DD065911.]   Not surprisingly, during this period, Debtdomain viewed Rothman as integral to its team, and his

25

input and participation vital for the success of the company. [*See, e.g.*, Ex. 64, Ex. 65, and Ex. 66.] Finally, it is undisputed that Debtdomain (through David Levy and Tamarind Holdings, LLC) paid Rothman (through his company, UGotAGeek, LLC) tens of thousands of dollars for these services. [*See* SOF § G and citations therein.]

By "accepting" employment and being "retained" by Levy, Levy's Tamarind Holdings LLC, and/or Debtdomain – businesses that were working to compete with FIS through their development and/or sale of the Debtdomain Product – prior to September 12, 2008, Rothman plainly violated the Rothman Order and should be held in contempt. *See Atlantic Recording,* 2009 WL 1390848 at *8 (holding that plaintiff satisfied second factor where defendant knew terms of court's order and distributed recordings at issue).

### 2. The Record Contains Clear And Convincing Proof Of Rothman's Systemic Violation Of His Confidentiality Obligations

The Rothman Confidentiality Agreement, in no uncertain terms, obligated Rothman, *both during and after his employment with FIS*, not to use or disclose "Confidential Information"; that is, "confidential or proprietary information consist[ing] of knowledge or information not generally known to the public or in the information technology industry." [*See* SOF § B; Ex. 7 at F0000761, Preamble and Section 1.] Section 2 of the Rothman Order reiterated and reconfirmed Rothman's obligation to "not use or disclose [FIS'] Confidential Information," and to otherwise comply with the Rothman Confidentiality Agreement. [Ex. 9, § 2.]

FIS has submitted clear and convincing proof of the many times and ways Rothman used and disclosed FIS' Confidential Information to help Debtdomain improve its systems and software. [*See* SOF §§ F,G, H, I, and J.] To summarize, Rothman used the knowledge and understanding of FIS, SyndTrak, and its customers gained through years of work as SyndTrak

developer and Product Manager at FIS to assist Debtdomain in developing and marketing a new Debtdomain Product. It was only by using FIS' information from Rothman that Debtdomain, for the first time, was able to compete with SyndTrak and lure customers away from FIS/SyndTrak to Debtdomain and its "SyndTrak-like" product. [*Id.*] Rothman further used Fidelity confidential information in doing data conversions, troubleshooting, and making software design suggestions and improvements. Rothman's repeated disclosures of FIS' Confidential Information further violated the Rothman Order.

### 3. The Record Demonstrates That Rothman Failed To Diligently Attempt to Comply With The Rothman Order

Rothman undoubtedly failed to take reasonably diligent efforts to comply with the Rothman Order. "Reasonable diligence" in this context requires a party to have been "energetic in attempting to accomplish what was ordered." *See EEOC v. Local 638, Local 28 of Sheet Metal Workers' Int'l Ass'n*, 753 F.2d 1172, 1178 (2d Cir. 1985) (holding that lack of reasonable diligence to confirm compliance with order warranted imposition of contempt sanction). The record demonstrates that rather than use *any* reasonable diligence to comply with the Rothman Order, Rothman, Levy, and Debtdomain instead chose to flagrantly defy the order and focus their energy on covering up those violations. The record shows that the defendants funneled payment to Rothman for his services to Debtdomain through Tamarind, Levy's LLC, to try to insulate Rothman, Levy, and Debtdomain from claims of non-compliance with the Rothman Order; and the Defendants assiduously avoided referring to Rothman by name in their communications, instead referring to him as "he who cannot be named" and "you know who." [*See* SOF § G.] Deliberately circumventing the Rothman Order and then trying to cover it up is

a far cry from reasonable diligence, and the concealment shows only that defendants well knew and understood they were doing wrong.

Nor can Defendants claim "reasonable diligence" by mis-characterizing Rothman's work as mere "due diligence" on behalf of Levy for a potential investment in Debtdomain. [*See* SOF § F.] There is ample proof that Rothman's services went far beyond mere "due diligence" of a potential investment in Debtdomain. [*See* SOF §§ G, H, I, and J.] To the contrary, Rothman's activities over many months centered around development and design activities for the Debtdomain Product, as well as in providing Debtdomain with advice regarding strategic customer initiatives. [*Id.*]

The clear and convincing evidence thus shows that Rothman (and the other Defendants) not only failed to attempt to diligently comply with the Rothman Order, but rather flagrantly breached it and performed an elaborate charade to try to disguise it.

**B.    By Knowingly And Actively Working To Assist Rothman's
Conduct, Levy And Debtdomain Are Also Liable In Contempt**

Rothman, of course, did not act alone. Levy and Debtdomain acted in concert with Rothman to compete against FIS, in knowing violation of the Rothman Order. Levy's and Debtdomain's conduct mandates the imposition of contempt sanctions against each of them, in addition to Rothman.

It has long been held that one who, with actual notice of an order, "knowingly assists a defendant in violating an injunction subjects himself to civil . . . proceedings for contempt." *Alemite Mfg. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930); *see also Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002); *Paramount Pictures Corp. v. Carol Pub'g Group*, 25 F. Supp. 2d 372, 374 (S.D.N.Y. 1998), *aff'd*, 181 F.3d 83 (2d Cir. 1999); *Regal Knitwear Co. v. NLRB*,

324 U.S. 9, 14, S. Ct. 478, 481 (1945) ("Defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding."). In determining whether a non-party aided and abetted a contempt violation, the court's inquiry is "'directed to the actuality of concert or participation, without regard to the motives that prompt the concert or participation.'" *Eli Lilly & Co. v. Gottstein*, No. 07-1107, 2010 WL 3168649, at *5 (2d Cir. Aug. 12, 2010) (quoting *N.Y. State Nat'l Org. for Women v. Terry*, 961 F.2d 390, 397 (2d Cir. 1992), *vacated on other grounds sub nom, Pearson v. Planned Parenthood Margaret Sanger Clinic (Manhattan)*, 507 U.S. 901, S. Ct. 1233 (1993)).

Levy and Debtdomain actively promoted and participated in Rothman's violations of the Rothman Order to the detriment of FIS. From January 2008 through September 11, 2008 and thereafter, Levy and Debtdomain acted in concert with Rothman to use Rothman's services and FIS' confidential and proprietary information, in violation of the Rothman Order, to help Debtdomain improve the Debtdomain product and lure SyndTrak customers away from FIS. [*See* SOF §§ F, G, H, I, and J, and citations therein.] At the time, Levy and Debtdomain were fully aware that Rothman had been the chief SyndTrak programmer and former product manager and therefore had access to and was drawing upon his knowledge of FIS' confidential, trade secret and proprietary information relating to SyndTrak and FIS' customers in helping develop a "SyndTrak-like" Debtdomain product to compete directly with FIS. Defendants also cannot dispute that they each were aware of the terms of the Rothman Order and that it precluded him from working for Debtdomain on or before September 11, 2008. [*See* SOF § F, and citations therein.] Consequently, Levy and Debtdomain acted in concert with Rothman in violating the Rothman Order to develop the competing Debtdomain Product, and their assistance warrants a

finding of contempt against each of them, in addition to Rothman.  *See Eli Lilly*, 2010 WL 3168649, at *5.

## POINT II

### THE APPROPRIATE REMEDIES FOR DEFENDANTS' CONTUMACIOUS CONDUCT

This Court "has broad discretion to fashion sanctions to coerce compliance with its orders and compensate Plaintiff for [Rothman's] noncompliance." *U2 Home Entm't v. Hong Wei Int'l Trading,* No. 02 Civ. 5828 (JFK), 2005 WL 3766976, at *7 (S.D.N.Y. May 31, 2005) (citing *N.A. Sales Co. v. Chapman Indus.*, 736 F.2d 854, 857 (2d Cir. 1984)).[6] The sanction need "not always [be] dependent on a demonstration of actual pecuniary loss," because "under a theory of unjust enrichment, a contempt plaintiff is entitled to defendant's profits without submitting direct proof of injury." *Manhattan Indus. v. Sweater Bee By Banff, Ltd.*, 885 F.2d 1, 5-6 (2d Cir. 1989) (holding that plaintiff was permitted to recover defendant's profits as compensatory sanctions against the defendant where the defendant had violated the terms of an injunction entered for the plaintiff's benefit); *Local 28 Sheet Metal Workers Int'l Assoc.*, 247 F.3d at 336 (court has "broad discretion to fashion an appropriate coercive remedy . . . based on the nature of the harm and the probable effect of alternative sanctions"; and ordering defendant contemnor to place funds in escrow for future payment to plaintiffs).

---

[6] *See also Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs.*, 369 F.3d 645, 657 (2d Cir. 2004) ("The imposition of civil contempt sanctions may serve dual purposes:  to secure future compliance with court orders and to compensate the party that has been wronged."); *EEOC v. Local 28 Sheet Metal Workers Int'l Assoc.*, 247 F.3d 333, 336 (2d Cir. 2001) (holding that a district court has "'broad discretion to fashion an appropriate coercive remedy . . . based on the nature of the harm and the probable effect of alternative sanctions") (quoting *N.A. Sales*, 736 F.2d at 857).

**A.     Rothman's Violations Of The Rothman Order
        Deprived FIS Of Its Benefits And Warrant The
        Imposition Of A New One-Year Non-compete Period**

Rothman's flagrantly contumacious conduct warrants a contempt sanction against Rothman imposing a new one-year non-competition period from the date of the Court's ruling on this motion. Rothman provided key services to a FIS competitor for a period of at least seven months during the pendency of the twelve-month non-competition period contained in the Rothman Order, thereby depriving FIS of the protections to be afforded by that order and the benefit of FIS' bargain in agreeing to settle the prior action against Rothman.

Where a party like Rothman breaches a non-compete, courts are empowered to grant a relief enforcing the entirety of the non-competition period from the date of the order remedying the breach. *See Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585, 602-603 (S.D.N.Y. 2010); *see also Marsh USA Inc. v. Karasaki,* No. 08 Civ. 4195 (JGK), 2008 WL 4778239, at *21 (S.D.N.Y. Oct. 31, 2008) ("Given that [defendant] has been in flagrant breach of the agreements since his resignation, the Court grants a preliminary injunction enforcing the entire one-year agreement . . . beginning from the date that an Order issuing the preliminary injunction is filed."). FIS respectfully submits that the appropriate remedy for Rothman's repeated violation of his court-sanctioned obligations to FIS, and to compel future compliance with those obligations, is an order barring Rothman from competing with FIS, for a period of one year from the date of its ruling on this motion.

**B.     Levy's and Debtdomain's Active Participation And Abetting
        Of Rothman's Violations Of The Rothman Order Demand The
        Imposition Of A One-Year Ban On The Sale Of The Debtdomain Product**

Levy and Debtdomain's active participation and abetting of Rothman's flagrantly contumacious conduct also warrant a contempt sanction against Levy and Debtdomain barring

them from selling the Debtdomain Product for a period of one year.  Here, Levy and Debtdomain actively encouraged Rothman's improper disclosure of FIS Confidential Information to improve the Debtdomain Product, as well as Defendants' business prospects.  Moreover, Levy and Debtdomain retained Rothman to provide software development services and other critical support services prior to September 12, 2008 with actual knowledge of the noncompetition provisions of the Rothman Order.

        As a consequence of Defendants' actions, the  Debtdomain Product was materially evaluated and re-designed by Rothman – using FIS' confidential information – during the approximately one-year period of noncompetition to which FIS was entitled under the Rothman Order.  Without Rothman's active participation and violation of the Rothman Order, Debtdomain – which had previously been unable on its own to land a single FIS customer – would never have been able to compete effectively against FIS for the loan syndication market.  For example, Rothman's improper violations – in conjunction with the other Defendants – cleared the way for Levy and several other investors to make a $1 million investment in the cash-starved Debtdomain which enabled it to further develop the Debtdomain Product into a viable alternative to SyndTrak.  Rothman provided much needed expertise to allow Debtdomain to develop and upgrade the software and market the product; and he was involved in the critically important process of converting SyndTrak-based data from SyndTrak customers to Debtdomain, which enabled Debtdomain to establish itself as a competitor to FIS and SyndTrak.  Defendants' wrongful conduct has damaged FIS profoundly.  As a result of the Rothman-based changes to the Debtdomain Product, FIS has lost several customers to Debtdomain, and is threatened with the loss of additional business to Debtdomain.

        To partially redress the harm FIS suffered as a result of these wrongs, Debtdomain and

Levy should be precluded from selling, licensing, or otherwise benefiting from the Debtdomain Product, in any version which was developed following the time that Rothman began consulting for Debtdomain in or about May 2008, for one year. Such a one-year ban on Defendants' future use of the ill-gotten fruits of Rothman's breaches of the Rothman Order is reasonable, proper, necessary, and a just sanction for Levy's and Debtdomain's conduct.

**C.     Defendants Should Be Required To Disgorge Profits Gained Through The Violations Of The Rothman Order**

Because Defendants aided and abetted Rothman's violations of the Rothman Order, they should also be forced to disgorge the profits that flowed from those violations. *Atlantic Recording Corp. v. BCD Music Group,* No. 08 Civ. 5201 (WHP), 2009 WL 1390848, at *9-10 (S.D.N.Y. May 7, 2009). In both *Manhattan Indus. v. Sweater Bee By Banff, Ltd.*, 885 F.2d 1 (2d Cir. 1989) and *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.*, No. 96 Civ. 9721, 2002 WL 2012618 (S.D.N.Y. Sept. 3, 2002), this Court permitted plaintiffs to recover defendants' net profits as compensatory sanctions against defendants to redress violations of injunctions and judgments entered to protect the plaintiffs.[7] Accordingly, FIS respectfully requests an award of Levy and Debtdomain's net profits flowing from Rothman's improper work for Debtdomain and confidential disclosures.

For the same reasons, Rothman should not be permitted to retain compensation earned in violation of the Rothman Order. FIS is therefore also entitled to, and seeks an award disgorging Rothman's profits and other compensation he wrongfully received for the services he rendered in violation of the Rothman Order.

---

[7] *See Sweater Bee*, 885 F.2d at 7 (holding that plaintiff was entitled to profits derived by defendant for sales made during period in which defendant was in contempt of court's consent judgment); *A.V. By Versace, Inc.*, 2002 WL 2-12618, at *11 (awarding plaintiffs defendants' net profits as "compensatory fine").

**D.**      **FIS Should Also Be Awarded Attorneys' Fees And Costs**

FIS is entitled to an award of its attorneys' fees and costs in connection with this motion. It is well settled that the Court is empowered to award attorneys' fees and costs to a victim of civil contempt. *Weitzman v. Stein,* 98 F.3d 717, 719 (2d Cir. 1996). Although willfulness is not a prerequisite to an award of fees and costs, a finding of willfulness strongly supports their recovery. *Id.* In view of Rothman's willful and persistent violation of the Rothman Order, as well as the other Defendants' active and knowing participation in those violations, FIS is entitled to recover from defendants its attorneys' fees and costs incurred in connection with the instant motion. *See Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 642 F. Supp. 2d 276, 301 (S.D.N.Y. 2009) (awarding recovery of $541,913.65 for attorneys' fees and costs incurred in connection with "all aspects of the contempt proceeding").

## CONCLUSION

For all of the foregoing reasons, FIS respectfully requests that the Court grant its motion

for an order holding Defendants in contempt of the Rothman Order in its entirety, and grant such

other and further relief as the Court may deem just and proper.

Dated: September 22, 2010
      New York, New York

                    Respectfully submitted,

                    **REAVIS PARENT LEHRER LLP**
                    *Attorneys for Plaintiff*
                    *Fidelity Information Services, Inc*

                    By _Mark H. Moore_
                    Mark H. Moore
                    mmoore@rpl-law.com
                    41 Madison Avenue, 41st Floor
                    New York, NY 10010
                    Tel.:(212) 763-4100
                    Fax: (212) 763-4141

Of counsel:
Lawrence Brocchini
John B. Dawson
Mitchell Feller
Jonathan M. Sobel